(58 Misc. Rep. 154.)

## In re CRAVATH.

(Court of General Sessions of the Peace, New York County. February, 1908.)

WITNESSES—PRIVILEGED COMMUNICATIONS—APPEARANCE BEFORE GRAND JURY.

> Where a person summoned before the grand jury by the district attorney was examined as to sale of railroad property to ascertain if he, in connection with others, had stolen a sum of money, and refused to waive his privilege and permit his counsel to testify as to communications to him respecting the transaction, though the witness answered the interrogatories of the district attorney as to such transaction under the compulsion of law, in so doing he did not waive his privilege and could not be required to reveal a communication confided to his counsel, nor could the counsel be compelled to disclose such communication.

Application to punish Paul D. Cravath for contempt. Application denied.

William Travers Jerome, Dist. Atty., for the People.

Alton B. Parker, John L. Cadwalader, and Howard S. Gans, for respondent.

ROSALSKY, J. Paul D. Cravath, the respondent, an attorney and counselor at law, was subpœnaed as a witness before the grand jury, and, having been duly sworn, was asked by the district attorney to testify as to what Thomas F. Ryan, his client, had told him in regard to the sale to the Metropolitan Securities Company of a certain railway, known as the Wall & Cortlandt Street Ferries Company, regarding which sale the grand jury was conducting an investigation for the purpose of ascertaining whether or not "the said Ryan and others in connection with the sale of the said railway company had stolen the sum of $111,652.78." The said Paul D. Cravath declined to answer the questions propounded by the district attorney, upon the ground that he was counsel for Ryan, and that what Ryan had told him concerning the matter about which Cravath was to be interrogated was in the nature of a communication between attorney and client, and that his client, Ryan, had not instructed him, Cravath, that he had waived the privilege. The grand jury thereupon, on the 11th day of December, 1907, made the following presentment to the Court of General Sessions:

"The grand jury of the county of New York, duly impaneled in the Court of General Sessions of the Peace in and for the county of New York, for the November, 1907, term, respectfully presents to the court that: It has for some time been conducting an investigation for the purpose of determining whether or no crimes have been committed within the county of New York, especially in connection with the sale of the securities of a certain railway, known as the Wall & Cortlandt Street Ferries Company, to a certain corporation, known as the Metropolitan Securities Company. That it has taken a considerable amount of testimony relative to this matter, and has sworn and heard the testimony of several witnesses. That, among other witnesses called before the grand jury, was one Thomas F. Ryan. That the said Thomas F. Ryan was duly sworn as a witness, and in the course of his examination it appeared that one Paul D. Cravath, an attorney at law practicing in the city of New York, had acted as counsel for the said Thomas F. Ryan. The said Ryan gave testimony at length in regard to his connection with the sale of the securities above mentioned. and, being asked if he would waive any privilege of attorney and client which might exist between himself and the said Paul D. Cravath relative to communications made in connection with

the aforesaid sale, he, the said Ryan, declined to waive said privilege. That in the course of the examination of said Ryan the following questions were asked and the following answers made:

" 'Q. Now, since the discussion of these matters (that is, matters relative to the purchase aforesaid), have you conferred with Mr. Cravath in regard to the details of transactions whereby the Metropolitan Securities Company acquired title to this railway? A. I have talked to him generally about it; not in detail. Q. What did Mr. Cravath say about it? A. About what? Q. About the transaction—the sale of this railway company? A. Why he told me that Mr. ———, that he had his transactions with Mr. Whitney. Q. And what transaction did he say he had? A. That the—that these railroads were to be sold to the Metropolitan Securities Company. Q. What I want to find out now is this particular railway, because this is the one specially under investigation—this Wall & Cortlandt Street Ferries Road. What did Mr. Cravath say about that? A. Well, he said that the road was to be sold to the Metropolitan Securities Company for this amount of money. Q. Did he say how it came about to be sold for that amount of money? A. No. Q. Did you ask him? A. No. Q. Did he say whether or no he knew at the time of the sale the amount of money that was to be paid? A. He did not. Q. Did he state whether or no the check came through his office? A. No; he did not. Q. Did he state whether he knew of or furnished the memorandum to Brady according to the provision that was made? A. That came up recently, and he said he did not. My recollection is that he said he did not furnish any memorandum. Q. What did he say was sent from his office to Brady? A. He did not say. Q. Now did you tell him what your idea of this transaction was—of this purchase or sale? A. After we began to discuss it, I told him just what I told you. Q. What you have told Mr. Cravath in regard to this transaction is in substance what you have testified to before this grand jury? A. Practically, yes. Q. Well, what else of a substantial character have you told him in regard to this transaction, other than what you have testified to? A. I don't remember anything else. Q. Have you told him what you thought this $500,000 was for? A. No, sir; well, I told him. Q. As you have told it here? A. As I told it here. That is all. Q. Was there anything more than what you have told here in regard to this transaction—this sale —that you have told Mr. Cravath? A. No, sir.'

"That theretofore the said Ryan had explained at considerable length his connection with the said Wall & Cortlandt Street Ferries Company, and had testified as to such knowledge as he had in regard to its sale. That one of the questions that the grand jury was investigating was whether the said Ryan and others in connection with the sale aforesaid of said railway company had stolen the sum of $111,652.78. That thereafter the said Paul D. Cravath was called as a witness before the grand jury, and, having been duly sworn, was asked by the grand jury to testify as to what the said Thomas F. Ryan had told him, Cravath, in regard to this transaction—the sale to the Metropolitan Securities Company of the railway above mentioned—and he, the said Paul D. Cravath, stated in substance that he could not answer such questions because it was a communication between attorney and client and that the client, to wit, Thomas F. Ryan, had not instructed him that he had waived the privilege. The said Cravath was then in substance informed of the testimony above set forth, and his attention was called to the fact that the said Ryan had informed the grand jury that he, Ryan, had in substance told him, Cravath, what he, Ryan, afterward testified to before the grand jury, and that there was nothing else in regard to this sale that he, Ryan, had told the said Cravath that he had not told the grand jury. Said Cravath still persisted in refusing to answer the questions, stating in substance that he considered it his duty as an attorney not to answer, even though his client, the said Ryan, had himself testified in regard to the said transaction and as to Ryan's communications to him, Cravath, in reference to the same. All of these matters will appear more fully and at large in the minutes of the proceedings before the grand jury, to which the grand jury respectfully refers the court, should the questions involved be not sufficiently set forth in this presentment. The grand jury deems it important that the said Cravath should answer the questions put to him, if they be lawful and proper

questions for him to answer. It therefore presents the matter to the court.
for such action in the premises as may seem to it just and meet.

"E. W. Bloomingdale, Foreman."

The said Paul D. Cravath was present in court when the present-
ment was read, and was asked, in the presence of the grand jury,
whether or not he would answer the questions propounded to him by
the district attorney before the grand jury. In reply, the learned coun-
sel, representing the respondent, declined to withdraw the refusal al-
ready made before the grand jury, and stated that he would not, if re-
called, answer the questions. On the application of the district attor-
ney an order was granted requiring the respondent to show cause why
an order should not be made adjudging him in contempt for his fail-
ure to answer the questions mentioned in the presentment.

In order to be in a position to properly pass upon the important ques-
tion raised upon this motion, it is necessary to have a clear view of all
the happenings and circumstances before the grand jury, at the time
the witness Ryan was under examination, before he was interrogated
on the matter which the grand jury were then investigating. The pre-
sentment affords but little light on this subject; and, in order to ob-
tain accurate knowledge of what happened there, I have had recourse
to the minutes of the grand jury, and deem it necessary to quote at
some length such matters as, in my opinion, have an important bear-
ing on the question at issue. When the witness Ryan appeared before
the grand jury and was sworn, and before any information was elicited
from him, the district attorney stated to the witness Ryan that the
respondent was requested to communicate with him, Ryan, as to wheth-
er the client, Ryan, whom he, Cravath, represented, would be willing
to waive such privilege as the client might have in respect to his,
Cravath's, testifying as to matters he might have learned from the
client in a professional capacity. The district attorney stated that he
had received a letter from the respondent to the effect that he had
decided that he could not, consistently with his duty as a lawyer, com-
ply with the district attorney's request that his client waive his privi-
lege in respect to the communications made to him, and that the re-
spondent had reached this conclusion only after careful consideration
and consultation with several members of the bar. The witness Ryan
was then asked if he was willing to waive the privilege which existed
between the respondent and himself regarding matters communicated
to the respondent by him as his attorney in relation to all matters con-
nected with the Metropolitan Securities Company, the Metropolitan
Street Railway Company, and the different allied and consolidated
lines, to which the witness Ryan replied that he did not think he ought
to be asked to waive any right in the premises, but that he had no
objection to the respondent testifying as to matters communicated be-
fore he became his counsel. The district attorney then told the witness
Ryan that the grand jury wanted reliable evidence in regard to the mat-
ters under investigation; that it was a fact that a person whose in-
terests were involved was always considered a biased and prejudiced
witness, and therefore a witness who had a strong personal interest to
falsify in regard to any matters that might affect him unfavorably;
and that the grand jury, therefore, required not only the testimony of

the witness Ryan, who had a personal interest in these matters, but also the testimony of others, whose interests were simply of a professional character, and, therefore, were not under as strong a bias to modify their testimony in the direction of falsity as those who were interested; and that the grand jury, therefore, would like to have Ryan waive his privilege, so that the district attorney could interrogate his counsel. The witness Ryan was told that a refusal on his part to waive the privilege would be considered due to the fact that the respondent's testimony would not coincide with his. The witness thereupon replied that he had no such fear, and that he would endeavor to testify to the truth of all matters, but was unwilling that the privilege that existed between himself and his counsel should be waived. He was then asked why he was unwilling to have his testimony strengthened and corroborated by his attorney, and he replied that it would break down all relations between counsel and client, as he had had the very closest relations with his counsel, and because, to use the witness' own words:

"I don't want to give up any part or advantage I may have. I don't know where I am going to be attacked, or where I am going to be fought, before this thing is over."

The witness Ryan was further pressed by the district attorney as to his unwillingness to permit the respondent to testify, and he again replied that it would break down all relations between client and counsel, and, although he was told that the privilege was that of the client, and not of the counsel, and was enacted solely for the benefit of the client, he refused to yield his right in the premises. The district attorney, evidently dissatisfied with the witness' attitude in his persistence in refusing to waive the privilege, then stated to the witness Ryan that, for many years he had been the subject of persistent and venomous attacks in the public press, not only in the city of New York, but all over the country; that up to this time he had never had an opportunity to appear before a judicial body to which he could explain any of the transactions on which he was attacked; that this was the first opportunity afforded to show a small group of his fellow citizens, meaning the grand jury, that the attacks made on him were dishonest, and that his conduct was beyond reproach; and that he was responsible for closing the door to the grand jury by refusing to allow his counsel to testify. The district attorney then proceeded to examine the witness Ryan concerning the matter under investigation, and in the course of the examination put the following questions to the witness:

"Q. Now, are you willing to waive your privilege, as to those lawyers with reference to what was said and took place at that conference? A. No; I am not willing to do that, Mr. Jerome.

"Q. Well, then, you will have to proceed in detail and tell us everything that took place at those conferences. Mr. Ryan, when did it first take place, and who was present, and where did it take place?

"Q. Well, why aren't you willing to waive your privilege in regard to that? Was anything said at those conferences that you would consider in any way would show you had committed a criminal act?

"Q. What is your object of trying to involve this conference in secrecy, if they were straightaway transactions?

"Q. But you just told us that you cannot recollect. Now, these lawyers can recollect. They put in bills, and they may get the dates of this conference, so that they can place the conference.

"Q. You see, Mr. Ryan, it puts you in an extremely equivocal position. You tell us a story that on its face seems reasonable, seems to correspond with the facts as far as we know them, yet you shut the door, or endeavor to shut the door, to information that might in any way go further and throw more light than you personally are inclined to throw on the situation.

"Q. Don't you realize what a very equivocal position it is putting you in at this time?

"Q. Let me point it out to you. Maybe I don't make myself clear. You have told us a story which I say, as far as I know, seems to be consistent with such facts brought out before the grand jury and such facts as I have been able to discover on the outside, but it may not be the truth. It may be a fake story from start to finish. You may have in connection with this matter committed some crime for which you ought to go to jail, and it is the duty of this grand jury to find out whether you have or not.

"Q. Now, these men are all men in your pay. They are your lawyers. They certainly are not going to be prejudiced against you, and they are going just as far as they can not to tell anything that might in any way injure your interests, and yet at the same time they have not got the personal interest in the version that you give to these affairs that you have, and you are trying to bar this jury from finding out from these men in whom you have confidence whether you are telling this jury the truth. That is the situation.

"Q. I hardly believe, from what I have known of you in the past, that you would take this position without the advice of counsel.

"Q. Why do you object to your lawyer's doing the same?

"Q. Very well, sir. Why do you—here is the situation in which you are practically left by the testimony before the Public Service Commission. The ordinary man in the street thinks you five men are in the position of having practically stolen $111,000 apiece. This grand jury now knows that is not so; but the average man in this community believes that you and Mr. Whitney and Mr. Dolan and Mr. Elkins stole $111,000 of the Metropolitan Securities' money, each of you. The way Mr. Ivins has left that matter before the Public Service Commission, that is the natural inference to the man on the street. Now, the privilege of attorney and client is given for the benefit of the client, and not for the benefit of the attorney. We were predisposed to think, because there has been no explanation of this thing, that this was a very crooked transaction, and you endeavor to bar any information that the grand jury can get on this subject, except such as you are willing to give them, you who are interested. That is a very equivocal position to leave yourself in.

"Q. And the questions I will ask you will result in the legal waiving of this privilege which you refuse to waive. You see, my inquiry as to each of these transactions, each of the conferences, is going to be such that your testimony in regard to it will as a matter of law waive the privilege of these people; in other words, I can accomplish indirectly by the examination what can be done at once by your waiving the privilege.

"Q. Well, I will do that. (Witness requests an opportunity to confer with counsel.) Because I think, Mr. Ryan, you are being placed in an extremely false position, and you are being placed there by the advice of counsel that have not got breath and vision enough to see that this situation is one that requires to be dealt with other than by methods which closely approximate those of the 'shyster.' So we will leave that then as it is until we get it—so that you may consult with others.

"Q. On this question of privilege and have them let me know—that is, the grand jury—some time during the course of the week whether they are inclined to waive their privilege."

When Mr. Ryan again appeared before the grand jury the district attorney asked the following questions:

"Q. Mr. Ryan, since you were last before the grand jury, have you taken into consideration the question of allowing your attorney to testify in this matter. A. Yes, sir, I have advised with him, as I said I would. Q. And what conclusion did you reach—to still maintain the privilege? A. Yes, sir. Q. And not to waive it? A. Yes, sir; I have taken advice from outside

counsel also, and that is the advice I got from him.   Q. It will be necessary, in view of your not being willing to waive this privilege, it will be necessary for me to examine you at very much greater length than I have.  I could not examine you any further to-day, because I will have to go into each one of these transactions in minute detail.  If you have definitely decided that, we won't waste any more energy on this thing.  You have definitely decided not to voluntarily throw open to this grand jury that line of information, have you?   A. Yes, sir.   Q. Although you realize perfectly that you are practically accused of a criminal act?   A. I do;  I am sorry for it, but I—."

It is contended by the learned district attorney that, although Ryan expressly and persistently refused to waive the privilege which existed between himself and his legal adviser relative to the transaction under investigation, as the foregoing questions and the answers thereto, disclosed by the minutes of the grand jury, conclusively show, nevertheless his counsel should be compelled to disclose his client's communications to him, which he obtained in the course of his professional employment, because Ryan, as a witness before the grand jury, proceeded, in the presence of that body and of the district attorney, to testify fully as to the matters stated in the presentment and in the record of the proceedings before the grand jury.  The district attorney bases his contention upon the theory that, the object of the statute having been voluntarily defeated by the party for whose benefit it was enacted, there can be no reason for the enforcement of the rule which protects the confidential character of a communication between attorney and client, and cites these authorities: Hurlburt v. Hurlburt, 128 N. Y. 420, 28 N. E. 651, 26 Am. St. Rep. 482; King v. Ashley, 96 App. Div. 143, 89 N. Y. Supp. 482; Lecour v. Importers' & Traders' National Bank, 61 App. Div. 163, 70 N. Y. Supp. 419; McKinney v. Grand St. Prospect Pk. & F. R. R., 104 N. Y. 352, 10 N. E. 544; Marx v. Manhattan R. Co., 56 Hun, 575, 10 N. Y. Supp. 159; People v. Patrick, 182 N. Y. 175, 74 N. E. 843; Pierson v. People, 79 N. Y. 424, 35 Am. Rep. 524; Morris v. N. Y., O. & W. R. Co., 148 N. Y. 88, 42 N. E. 410, 51 Am. St. Rep. 675.

I have carefully read the cases cited, and have reached the conclusion that the elements in those cases differ materially from the case under consideration.   In Hurlburt v. Hurlburt, supra, the court held that, where two persons, both of whom were interested in the advice which they sought, and who were present at the same time and engaged in the same conversation with the attorney, since each heard what ·the other said, the disclosures made were not, as between them, confidential, and hence there can be ·no reason for treating such disclosures as privileged.   In King v. Ashley, supra, the attorney was required to answer the questions, because they were not of a ·confidential character, but merely related to information with respect to where the will of one William Van Rensallaer was probated, ·where William Van Rensallaer lived in his lifetime, who were the executors of the will, where the real or personal property was situated, the ·provisions of the will so far as it related to Moore, the approximate value of Moore's interest, who the life tenant was, ·if any, and his place of residence.   The attorney in this case testified that he obtained the information, not from his client, Moore, but from outside sources.   In Lecour v. Importers' & Traders' National Bank, supra, the court held that the attorney's man-

aging clerk might testify to a communication made to him by the executor, in the attorney's presence, where it appeared that such communication was made openly in the presence of two other persons, and not secretly and confidentially. In McKinney v. Grand Street R. R. Co., supra, the court held that, where a physician, who as such attended upon the plaintiff after the injury, was called as a witness in her behalf and testified to all the facts bearing upon her physical condition, learned by him while so attending upon her, upon a subsequent trial the defendant was entitled to call and examine such physician as a witness, since the patient expressly waived the privilege by calling the physician on the first trial. The information on the first trial was given with the patient's consent, and hence there was a publication of the information to the public, and therefore the patient was not privileged to forbid its repetition. In Marx v. Manhattan R. Co., supra, it was held, where the plaintiff, upon his direct examination, had pretended to give what took place between himself and his physician, the physician, although called by the defendant, was not prevented from testifying as to what took place between the plaintiff and himself, because the plaintiff, by his own testimony as to what had taken place between himself and the doctor, had waived his right to object to the examination of the latter in relation thereto. The patient may keep the door of the consultation room closed; but he cannot be permitted to open it, so as to give an imperfect and erroneous view of what took place there, and then close the door when the actual facts are about to be disclosed. In People v. Patrick, supra, the court held that the accomplice, Jones, could testify to the fact that he had told the counsel of his own guilt, and the fact that both Jones and the defendant had the same counsel did not prevent him from waiving the privilege accorded by the statute, and permitting the extension of the defendant's privilege so as to exclude his testimony. This decision was based on the ground that, since the privilege was the client's, he could waive it, and that Jones voluntarily waived it in open court. In Pierson v. People, supra, the court held that the statute did not cover a case where its prohibition was invoked solely for the protection of a criminal, and not at all for the benefit or protection of the patient who was dead, and a waiver of the prohibition had therefore become impossible. In Morris v. N. Y., O. & W. R. Co., supra, the court held, where a party, who has been attended by two physicians in their professional capacity at the same examination or consultation, both holding professional relations to him, calls one of the physicians as a witness in his own behalf in an action in which the party's condition, as it appeared at such consultation, is the important question, to prove what took place, or what the witness then learned, he thereby waives the privilege conferred by law, and loses his right to object to the testimony of the other physician, if called by the opposite party to testify as to the same transaction. This decision was based upon the principle that the waiver is complete as to that consultation when one of the physicians is used as a witness.

It will therefore be observed that the cases cited leave no room for doubt that in each instance the communication was either not of a confidential character, or that there was an express waiver of the privilege arising from the voluntary action of the patient or client, or that the

rule would not cover a case where it was invoked solely for the protection of a criminal, and not for the benefit or protection of the patient, who was dead, and a, waiver of the prohibition had, therefore,. become impossible. Our courts have jealously guarded the interests of the client or patient, so as not to permit the violation of the privileged communications made to an attorney or a physician, even to the extent that the client or patient may refuse to answer on cross-examination, when questioned as to the privileged communications; and where the client or patient, on cross-examination, has divulged the character of the communication, the attorney or physician is forbidden to reveal the communication itself.

In Kaufman v. Rosenshine, 97 App. Div. 517, 90 N. Y. Supp. 205, affirmed 183 N. Y. 562, 76 N. E. 1098, the plaintiff, as assignee of one Nina Kaufman, sued the defendants to recover the sum of $2,000, deposited by the assignor with the defendants. On cross-examination of the plaintiff's assignor it was established that at a time subsequent to the alleged deposit she made an affidavit in a divorce action setting forth that she was without means of support and had no separate property. The plaintiff's assignor was asked whether, when the affidavit was drawn, and in contemplation thereof, she had told her attorney of the existence of the claim in suit, and she replied that she had not told her attorney of such claim. The attorney for the plaintiff's assignor was then called by the defendant for the evident purpose of contradicting this testimony. The court excluded the attorney's testimony, on the ground that the communications which he received from the plaintiff's assignor were privileged. Mr. Justice Patterson, writing for the court, said:

"If the plaintiff's assignor had herself, as part of the plaintiff's case, testified as to communications made by her to her counsel, another rule would prevail; but that was not done here, nor was her privilege in any way waived. What she testified to in this regard was brought out on cross-examination, and 'to allow one party to extract from his adversary a conversation between the latter and his attorney, and then to call the attorney to contradict the client, would result in the grossest injustice. It would create an antagonism between the attorney and client, and in effect destroy the rule which treats such communications as privileged. No man would ever feel safe in consulting a lawyer, if such a doctrine was once established by the courts.'" Tate v. Tate's Executor, 75 Va. 533.

Upon the argument the district attorney stated that the only case tha that seemed to militate against his contention was the case of Kaufman v. Rosenshine, supra, but that this decision should not be followed, because the Court of Appeals did not affirm upon the opinion of the court below, but merely affirmed its judgment, and that, therefore, the exclusion of the testimony was not injurious to the defendant, and did not justify a reversal by the Court of Appeals. The answer to the district attorney's argument on this point is that, as the Court of Appeals affirmed the judgment, it must necessarily be assumed that it disregarded the objection and exception to the exclusion of the testimony referred to; for otherwise, if the objection had been well taken, there would have been a reversal of the judgment. Even though the Court of Appeals did not write an opinion affirming the decision of the Appellate Division, the affirmance determines that the decision of the·

learned Appellate Division is good law, and in line with the weight of authority on this subject.

In Lockwood v. House, 49 N. Y. Super. Ct. 501, Mr. Justice Ingraham, writing the opinion, said:

"The only exception insisted on by plaintiff's counsel on the argument was to the exclusion of the testimony of Mr. Fay, who was the attorney for the defendant in the proceedings in bankruptcy. The witness was asked to testify as to a conversation between himself and defendant, when defendant instructed the witness to prepare the proof of debt in the bankruptcy proceedings. The witness was allowed to answer the questions as to what was said on the subject of security, but was not allowed to testify as to the remainder of the conversation that occurred, on the ground that the communication was a privileged communication from a client to his attorney. I do not think that the evidence was competent, and it was properly excluded. The appellant insists, however, that, as the defendant had testified as to what took place at the interview referred to when he was examined as a witness, he thereby waived the privilege, and plaintiff should have been allowed to prove what happened at that time; but an examination of the testimony of the defendant will show that the account given by the defendant of the interview in question was in response to questions asked him by the plaintiff on cross-examination, and plaintiff made him for that purpose his witness."

In Butler v. Manhattan R. Co., 3 Misc. Rep. 453, 23 N. Y. Supp. 163, affirmed 143 N. Y. 630, 37 N. E. 826, the plaintiff, as a witness in her own behalf in an action for personal injuries, testified on her direct examination only as to her physical condition at the time of the accident. On cross-examination the defendant's counsel entered upon a lengthy investigation as to the prior history of the plaintiff, the ailments with which she had been troubled, the names of the physicians she had consulted, and the troubles for which they had prescribed. It was held that the physician could not testify against his patient, the plaintiff, since such matters were elicited on cross-examination, and the plaintiff did not waive her privilege, and that it could only be waived by her consent or by some act of hers tantamount thereto. This view is upheld by the weight of authority in other jurisdictions. Burgess v. Sims Drug Company, 114 Iowa, 275, 86 N. W. 307, 54 L. R. A. 364, 89 Am. St. Rep. 359; Tate v. Tate's Executors, 75 Va. 522; Ross v. Great Northern Ry. Co., 101 Minn. 122, 111 N. W. 951.

The inquiry as to whether or not the witness Ryan and others were guilty of any violation of the law was instituted by the district attorney, who is vested with authority to issue subpœnas, subscribed by him, for witnesses within the state, in support of the prosecution, to appear before the grand jury upon an investigation pending before them. Code Cr. Proc. § 609. It is not claimed that Mr. Ryan had announced his presence before that body and his desire to unbosom himself relative to the matter which the grand jury were then investigating. He did not go before that body of his own free will, but by process of law. Where a witness, in obedience to a mandate of the statute, appears before the grand jury at the instance of a public official, although he willingly obeys the command of the law, it cannot be said that his presence before that body is of his own choice. His appearance cannot be considered acquiescence. His presence is compulsory, as it is in obedience to the law. People v. Sharp, 107 N. Y.

427, 14 N. E. 319, 1 Am. St. Rep. 851; People v. Courtney, 1 N. Y. Cr. Rep. 575.

The witness Ryan, after he had refused to waive the privilege, was told by the district attorney that he would have to proceed in detail, and tell everything that took place at the conference with his attorney. The district attorney also said that he could accomplish indirectly by an examination of the witness what could be done at once by the witness' waiving the privilege. The answers to the questions propounded by the district attorney, after the witness Ryan was admonished that, if he would not disclose the confidential information imparted to his attorney, the district attorney would obtain the same result by the process of examination, were elicited by compulsion, and therefore the publication of a confidential communication under such circumstances was not the result of a voluntary act of the witness, but was due rather to the coercive measures adopted by the district attorney. No attempt of the district attorney to force the witness to yield the privilege could effect any such result. In Clifford v. Denver & R. G. R. R. Co., 188 N. Y. 349, 80 N. E. 1094, the court held that a voluntary disclosure of the privileged testimony was conclusive evidence of an intention to waive the privilege and that the intention to waive was the essence of a waiver.

Since the witness Ryan in the most positive terms refused to waive the privilege which belonged to him, I am of the opinion, in the light of the authorities cited, that the district attorney could not by a compulsory line of examination require the witness, against his will, to reveal the communication confided to his counsel. Inasmuch as our courts do not permit the disclosure of a confidential matter on cross-examination, a court should protect the rights of a witness who is subjected to an unlawful examination before the grand jury. It cannot be denied that the witness Ryan was subjected to rigorous test to elicit from him the nature of a confidential communication to his attorney. If such an examination of a witness would not be permitted in a court of justice, where the rules of evidence prevail, then it should not be permitted in the grand jury room; that body being enjoined by law to receive none but legal evidence. Code Cr. Proc. § 256. It does not follow that, because a trial judge did not preside over the proceedings of the grand jury, the grand jury is freed from the restraints of the law of evidence, or that the district attorney, who is one of the legal advisers of the grand jury, can transform a legal inquiry before a grand jury into an inquisitorial proceeding; and to what extent the district attorney may question a witness is likewise limited by the rules of evidence. It was aptly said by former Recorder (now Mr. Justice) Goff, in Matter of Morse (Gen. Sess.) 87 N. Y. Supp. 721, concerning the conduct of a district attorney in the examination of a witness before a grand jury:

"But the methods used must be fair and legal. They must not be coercive or inquisitorial, and a tribunal established or a procedure designed by law for one purpose cannot be perverted to another purpose, even though the latter be meritorious. It is better that Dodge, if guilty, should go unpunished, than that the powers of the grand jury should be invoked for an unlawful purpose."

It will therefore be readily seen that the seal on the attorney's lips would not give any protection to the client, if the client could be placed upon the witness stand, and forced to testify as to a communication between himself and his attorney in the course of his professional employment; and it must inevitably follow that the client cannot be compelled to disclose communications which his attorney is expressly forbidden to disclose. Under the common law, and later by statute and by judicial interpretation, the protection of the client's privilege was made distinct and emphatic; it being intended to promote freedom of consultation with a legal adviser. The privilege is founded on public policy, and in all cases where it applies the seal of the law must remain until it is removed by the voluntary act or consent of the client. This inviolable right is guaranteed to the patient and to the penitent alike.

The learned counsel representing the respondent urged upon the court that the only method by which a witness can waive the privilege is that provided for by section 836 of the Code of Civil Procedure. As I have come to the conclusion that the witness Ryan did not waive his privilege before the grand jury, I regard it as unnecessary to discuss the section referred to.

I find, therefore, that for the reasons herein stated the respondent was justified in refusing to answer the questions set forth in the presentment herein, and the application of the district attorney to punish the respondent for contempt of court is denied.

Application denied.

(58 Misc. Rep. 136.)

### VAN ALLEN v. SHULENBURGH.

(Montgomery County Court. February, 1908.)

1. ACCORD AND SATISFACTION—WHAT CONSTITUTES.

Plaintiff had sold defendant goods, and A. owed· defendant money. By agreement between the parties A. was to credit plaintiff and charge defendant with the amount of the price. *Held* to constitute an accord and satisfaction.

2. SAME—PLEA.

Where plaintiff sold defendant goods, and A. owed defendant, and it was agreed that A. should credit plaintiff and charge defendant with the amount of the price, in an action by plaintiff against defendant for the price, an answer that plaintiff was fully paid and satisfied, and plaintiff and defendant had adjusted said claim, and defendant was released, was sufficient.

3. JUSTICES OF THE PEACE—APPEAL—OBJECTIONS NOT RAISED BELOW.

Where, in an action before a justice, defendant pleaded accord and satisfaction, and no objection was raised at the trial to the evidence on the ground that the accord had not been sufficiently pleaded, no such objection can be raised on appeal from a judgment for plaintiff.

4. APPEAL—HARMLESS ERROR.

Where a judgment for nonsuit at the close of the case was properly denied, the denial of a motion for nonsuit at close of plaintiff's case was not reversible error.

Appeal from Justice Court.

Action by James N. Van Allen against John C. Shulenburgh. Judgment for plaintiff before a justice, and defendant appeals. Reversed.