Argued January 24, reversed April 2, 1929.

# OLIVER J. COLES *v.* CHESTER A. HARSCH.

(276 Pac. 248.)

ROSSMAN, J.—The defendant presents for our disposal several assignments of error. We shall first consider the one which is based upon the endeavor of the plaintiff to impeach the testimony of one James A. Thompson, who was one of the defendant's principal witnesses. In order to better understand the situation presented by this assignment of error, it seems desirable to state the following undisputed facts. While the parties were married to their former wives, the two couples belonged to the same social group; they frequently met at card parties, dances and other social diversions, and frequently visited back and forth. The plaintiff contended that at some time in 1923 he noticed that the defendant was developing a propensity for wrestling with the plaintiff's wife, and engaging in other similar play with her. It was his contention that this propensity

of the defendant did not abate with the passing of time, but that it grew more pronounced, and the plaintiff contended that it constituted one of the means which the defendant employed for winning the affections of the plaintiff's wife. This seems to be a rather unusual method of lovemaking, yet if current reports are reliable it is not the first instance where a cicisbeo has delved into the distant stone age and brought forth a somewhat rough and uncouth method of endearment, which well served his purpose, and brought about the desired result. Be this as it may, it will suffice to say that much time was consumed in the trial court in taking testimony concerning these wrestling and similar encounters and the extent to which other members of the parties participated in them; there was also testimony, not all in harmony, however, concerning the plaintiff's protests against the activities along these lines of his wife and the defendant and the latter's replies and rejoinders thereto.

■ As we have said, one of the defendant's principal witnesses was a Mr. James A. Thompson. The latter and his wife were members of this social group. His testimony, apparently important to the defendant, covered these wrestling encounters, the social diversion of the group, and the relationship between the defendant and Mrs. Coles, plaintiff's former wife. If his testimony was accepted as truthful by the jury, the defendant's conduct towards Mrs. Coles was the same as his conduct towards other women friends, and was proper and harmless. Apparently nothing developed upon cross-examination which obviously discredited this witness; but, upon rebuttal the plaintiff was permitted over objection to testify

that "at the time I was in the garage where he works" Thompson told him that at a picnic held on the banks of the Pudding River the conduct of the defendant and Mrs. Coles toward each other was disgraceful. Before defendant's objection was ruled upon plaintiff's counsel stated that the purpose of the contemplated answer was to "go to the credibility of Thompson." The objections of the defendant to the questions, which elicited the above answer, were specific and were reiterated; they were to the effect that if the plaintiff sought this information to substantiate the charges of his complaint the inquiry was in violation of the hearsay evidence rule: that if the plaintiff sought to answer for the purpose of impeaching Thompson he had not laid the proper foundation by making a similar inquiry of Thompson accompanied with the details of time, place and persons present. The merits of the first alternative of the objection are so self-evident, Wigmore on Ev. (2 ed.), § 1018, *Smitson* v. *Southern Pac. Co.*, 37 Or. 74 (60 Pac. 907), that we deem it necessary to set forth our consideration only of the second phase of the objection.

Section 884, Or. L. provides:

"A witness may also be impeached by evidence that he has made, at other times, statements inconsistent with his present testimony; but before this can be done, the statements must be related to him, with the circumstances of times, places, and persons present; and he shall be asked whether he has made such statements, and if so, allowed to explain them. If the statements be in writing, they shall be shown to the witness before any question is put to him concerning them."

It is necessary, therefore, to examine the inquiries propounded to Thompson and determine whether a similar question was put to him which complied with this statutory rule. Pausing for a moment, it is worth while to observe that this requirement does not invoke an idle ceremony, but is intended to serve a useful purpose. Every witness, whose testimony is shown in conflict with a previous statement made by him, is not necessarily revealed thereby as a dishonest person; the impeachment, in many instances, may uncover only a faulty memory in the discredited witness. The requirement that the identifying circumstances of time, place, those present, and the statement that the witness then made shall be related to him, is founded upon the experience, which frequently presents itself in the courtroom, that a witness, who has stoutly denied having made an alleged statement may finally blushingly and apologetically admit it, when the questioner throws into association with it identifying circumstances. It is a common observation that associated ideas, as they are related, one after another, not infrequently succeed in upturning a fact which previously had defied all efforts of recollection. And so this rule of evidence is intended to reveal not only the dishonest witness, but is also intended to afford all witnesses ample opportunity to recall a fact before they may be assailed as dishonest. The requirement also tends to reduce to the minimum a confusion of issues by eliminating unnecessary impeachments: Wigmore on Ev. (2 ed.), § 1019.

■ Approaching the statutory requirement thus broadly as one intended to serve a practical, useful end, let us see what the record presents. On direct

examination Thompson was asked concerning a conversation he had had with the pla'ntiff at the Bybee Avenue Garage; the witness stated that the conversation occurred so long ago that his recollection had become somewhat vague, but he recalled that at that time the plaintiff said that his wife was going to get a divorce. No further questions were asked him on direct examination concerning that conversation. The time of this conversation was not fixed, nor were those present mentioned and he was asked nothing concerning the Pudding River incident. On cross-examination he was asked whether he recalled "talking to Mr. Coles about that trip to the Pudding River"; he replied in the negative. This was the only foundation laid for the impeaching question; we believe it was insufficient. It may be that Thompson was untruthful, but before the plaintiff could avail himself of such an argument he should have prepared the necessary promise by submitting to Thompson the alleged statement accompanied by the identifying circumstances. Since this was not done, error was committed when the impeaching witness was permitted to answer.

■ The defendant assigns error predicated upon the refusal of the court to permit him to show that others in their social group engaged in similar acts of wrestling, and that none made complaint. While the purpose to which the defendant expected to put the answer is not clear to us, yet, apparently, he planned to show thereby that he had complied with that dubious code of conduct which is indicated by the formula, "When in Rome do as the Romans do," and that, therefore, his repeated acts of roughing the plaintiff's wife could not constitute the foundation of

an action of this character. To us it seems that the injection of such inquiries into the case would have brought the jury but little profit. An ordinary juror can readily determine without such assistance, the probable result of a man wrestling with another's wife, rolling upon her on the floor, tearing her clothes, and engaging in similar acts of buffoonery. If the right or wrong of such conduct is not apparent to him he would be incapable of deriving any assistance from testimony which would inevitably inject into the case an additional issue through affirmances on the one side and denials on the other. If this evidence was admissible we assume that similar testimony would likewise be admissible as to the various other acts of misconduct alleged by the plaintiff against the defendant. No error was committed when this evidence was excluded.

■ Upon cross-examination of the defendant the plaintiff was permitted to inquire over the defendant's objection as to what the latter's former wife had told him about her intention to return to Oregon. The plaintiff stated his purpose as follows: "I am going to use this as an impeaching question." But the difficulty that lies in the way of using the answer for that purpose is that the inquiry was upon a collateral matter. We are told that the test of collateralness is: "could the fact, as to which the prior self-contradiction is predicated have been shown in evidence for any purpose independently of the self-contradiction": Wigmore on Ev. (2 ed.), § 1020. If the plaintiff sought this information merely for the purpose of catching the defendant in an untruth, the objection should have been sustained.

■ The plaintiff was permitted, over the defendant's objections, to read in evidence an affidavit signed by the defendant which averred the nonpresence in Oregon of his wife; this was employed as the basis for publication of summons in the latter's suit for a divorce. The plaintiff contends that this evidence showed that the defendant was planning to get rid of his wife so as to be in a position to marry the plaintiff's wife. The complaint alleged and the answer admitted, that prior to January, 1926, the defendant was married to plaintiff's sister, and that in that month his wife obtained a divorce from him upon a cross-complaint in a suit filed by him. Inquiries into the intricacies of that suit, after the above express agreement as to the defendant's matrimonial status, would merely import into this case an unnecessary collateral issue. We believe that the objection should have been sustained.

■ It is next contended that under the semblance of offering testimony to prove the state of feeling between the plaintiff and his former wife, he was permitted to testify to matters inadmissible for that purpose but which he employed to the disadvantage of the defendant in various particulars. One of these pieces of evidence arose out of an instance when Mrs. Coles came to the shop where the plaintiff was employed: the latter inquired of her whether she came by street-car or by automobile. He was permitted, over objections, to testify that she replied that she had come by the street-car and not by automobile. It will be readily observed that Mrs. Coles' reply, as related by the plaintiff, had no tendency to show the state of feeling between husband and wife. In fact the plaintiff does not seem to claim that it

possesses any such quality; but argues that this evidence was very important "as it shows that the appellant brought plaintiff's wife over to the shop and he kept at a safe distance." It is obvious that the hearsay evidence rule was violated when the statement was used for this purpose.

■ We shall mention one more piece of this type of evidence and then consider the application of the verbal act doctrine. June 1st Mrs. Coles left the plaintiff's home; thereafter he endeavored to persuade her to return; when his efforts proved fruitless she consulted an attorney so as to arrange for a divorce suit on behalf of his wife. At about this time Mrs. Coles and the plaintiff held a conference concerning the adjustment of their property rights; over the defendant's objections the plaintiff was permitted to narrate what occurred at this conference as follows:

"A. During the time between the separation and the divorce, while the papers were being drawed up we got to talking one night about the place that we owned. We owned it jointly together. And I asked her how much she figured was hers. She says, well, she didn't know. I says, 'Well, if I sell the place and pay off what I owe, doctor bills and so on,' I said, 'there will be about $700.00 left.' I says, 'How much of that do you think you are entitled to?' Well, she says, 'I don't know.' She says, 'All I want is enough to live on for about six months,' and I says, 'Well, I will tell you what I will do,' I says, 'I will give you five hundred dollars.' But I says, 'I cannot pay you all at once, I will pay you so much a month'; I says, 'Will fifty a month be enough'—which I had already agreed to pay her fifteen dollars a month for the child—and I says, 'That will make you sixty-five a month.' I says, 'Will that be enough?'

She said, 'Yes,' she could get along very nicely on that for about six months.''

and still later he was permitted to add that he discharged the installment payments faithfully month by month.

All of this evidence was received for the purpose of showing ''just what attitude or frame of mind the parties were in in this matter, or the frame of mind the plaintiff's former wife was in towards the defendant.''

In *Pugsley* v. *Smyth*, 98 Or. 448 (194 Pac. 686), the admissibility of verbal acts to prove the state of feeling of one to another is carefully explained in an exhaustive opinion written by former Justice HARRIS. We quote:

'' * * The doctrine which sanctions the admission of verbal utterances constitutes an exception to the hearsay rule rather than a violation of it. The exception arises out of the ultimate fact, which is disclosed in the final analysis, that the utterance is in truth a natural and spontaneous verbal manifestation of an emotion, just as a facial expression or a gesture is the wordless manifestation of an emotion; and it matters not whether we call the vocal utterance a verbal act or a part of the *res gestae* or original evidence, for it is within the knowledge of all persons that a vocal utterance may be indicative of the feeling that inspired it just as a suddenly flushed cheek may be indicative of shame or surprise, or just as shattered nerves or trembling hands or a whitened face may be the natural and uncontrollable manifestations of fear: * * When, therefore, the state of a person's mind is the subject of inquiry, it is ofttimes competent to consider verbal utterances made by that person.''

In *Roesner* v. *Darrah*, 65 Kan. 599 (70 Pac. 597), the court well expressed the rule thus:

" * * when the inquiry involves the existence of a bodily or mental state, the declarations of the party, when under the influence of the physical or mental feeling in question, and disclosing his subjection to it, are not hearsay, but are original evidence. * * "

We fail to understand how the declarations made by the one to the other concerning their property rights, while they were conferring upon that subject, could be said to constitute the natural and spontaneous verbal manifestations of emotion. The plaintiff had previously detected a cooling off of his wife's affections; on prior occasions the two had discussed some burdensome debts which had recently been incurred. When it seemed necessary to employ an attorney for the divorce suit, their financial condition again was mentioned, and its unsatisfactory condition caused the plaintiff to employ an attorney whom he believed would be fair to both, rather than for each to secure an individual attorney. Under these conditions we believe it is evident that when the two finally met to divide their small estate, the bartering back and forth did not consist of spontaneous declarations revealing affection or its absence, but that their proposals and counter proposals were the product of calculation, deliberation and reflection. Such declarations do not have their promptings in the emotions of the heart, nor in the rancor of the spleen, but find their inception in the business acumen of the parties. Such being their nature these declarations were not admissible as verbal acts.

■ While upon the stand as a witness in his own behalf the plaintiff was permitted to testify to numerous communications made to him by his wife. This evidence also was offered to show that his wife had affection for him, and that it was finally alienated as

a result of the defendant's wrongful conduct. We have already considered and disposed of two of these communications. The several remaining ones seem to come under the verbal act doctrine, and were material and relevant to the issue before the court. Before considering the defendant's present objections to this line of evidence we shall add to it another piece of evidence of somewhat similar character, to which the defendant makes like objection: the plaintiff called as a witness in his behalf Mr. Frank Motter, the attorney who conducted the suit for the divorce. He testified to communications made to him by Mrs. Coles, to the effect that she was insistent upon a dissolution of the marriage contract and could not be persuaded to return to her husband. Substantially all of this evidence was received without objection. Now for the first time the defendant contends that the lower court should have excluded this evidence as privileged communication. He argues that its reception was violative of Section 733, Or. L., and that it was the duty of the Circuit Court to have rejected it upon its own initiative.

Some of Mrs. Coles' statements, related by the plaintiff as a witness, were made when others were present; one communication took place over the telephone wires. In *Pugsley* v. *Smyth, supra,* this court held that the general effect of Section 733, Or. L., is to privilege all communications between husband and wife, but pointed out "It is generally held that communications made in the presence of third persons are not privileged * * ." See to similar effect Wigmore on Ev. (2 ed.), § 2339, and 28 R. C. L., Witnesses, § 117. Hence we conclude that the communications made in the presence of third parties were not privileged. But, the problem remains whether

the reception of the plaintiff's testimony as to communications made to him by his wife was reversible error when no one interposed the objection of privilege. To sustain his contention that error available to the defendant was thus committed, the defendant calls to our attention the four Oregon cases of *Bryant* v. *Dukehart,* 106 Or. 359 (210 Pac. 454); *Pugsley* v. *Smyth, supra; Long* v. *Lander,* 10 Or. 175; *Sitton* v. *Peyree,* 117 Or. 107 (241 Pac. 62, 242 Pac. 1112). In the first of these cases the proper objection had been interposed; in the second, a ruling of the court had been obtained, while in the third, this court in sustaining the lower court's ruling presumed, in the absence of anything to the contrary, that the possessor of the privilege gave his consent when the communication was revealed by the witness. The fourth of these cases we believe contains nothing helpful to a solution of our present problem. It is true that the first three cases contain *obiter dicta,* or justify inferences which lend some support to the defendant's contentions. The defendant also calls to our attention the following authorities: *Humphrey* v. *Pope,* 1 Cal. App. 374 (82 Pac. 223); *O'Brien* v. *New England etc. Co.,* 109 Kan. 138 (192 Pac. 1100); *Hodges* v. *Millikin,* 1 Bland (Md.), 503; *Weil* v. *Weil,* 151 App. Div. 622 (136 N. Y. Supp. 190); *In re Cravath,* 58 Misc. Rep. 154 (110 N. Y. Supp. 462); *Hubbell* v. *Grant,* 39 Mich. 641; *Loucht* v. *Loucht,* 129 Ky. 700 (130 Am. St. Rep. 486, 112 S. W. 845); 40 Cyc. 2394, 2395.

We have carefully read all of these cases. Without undertaking to set forth an extended review of them we shall content ourselves with the observation that *Hodges* v. *Millikin,* and *In re Cravath* do not seem to lend significance to defendant's contention.

In *O'Brien* v. *New England etc. Co.*, the attorney-witness, in the absence of his client, invoked the privilege; this was held sufficient to exclude his testimony. In *Weil* v. *Weil* the privilege was that of the defendant, which is in marked contrast to that of our case, where the defendant is not the beneficiary of the privilege. A somewhat similar condition was present in *Hubbell* v. *Grant*. The reasoning of the courts in these two cases, however, seems to lend color to defendant's argument. In *Humphrey* v. *Pope* the general objection was held sufficient to invoke the privilege. While it is true that *obiter dicta* in some of these cases support defendant's contention, yet none of the decisions are squarely in point.

While we have not conducted an exhaustive search into the authorities, we have nevertheless found the following which are contrary to the defendant's contention: *Ruch* v. *State*, 111 Ohio St. 580 (146 N. E. 67); *Norris* v. *Stewart's Heirs*, 105 N. C. 455 (18 Am. St. Rep. 917, 10 S. E. 912); *Parkhurst* v. *Berdell*, 110 N. Y. 386 (6 Am. St. Rep. 384, 18 N. E. 123); *Pierson* v. *People*, 79 N. Y. 424 (35 Am. Rep. 524); *People* v. *Chadwick*, 4 Cal. App. 63 (87 Pac. 384); *Hunter* v. *State*, 10 Okl. App. 119 (Ann. Cas. 1913A, 612, L. R. A. 1915A, 564, 134 Pac. 1134); *Benson* v. *Morgan*, 50 Mich. 79 (14 N. W. 705); *Walker* v. *Fields* (Tex. Com. App.), 247 S. W. 272. We especially call attention to *Cohen* v. *United States*, 214 Fed. 23 (9th Cir., the case having arisen in this state). Believing, as we do, that the result is more likely to prove satisfactory if we examine the principles of law which underlie the situation than to merely cite authority, we shall undertake a brief examination in that respect.

It would seem clear that under our statutes (Or. L., § 733) the privilege of having the communication withheld from the witness-stand was that of wife; she subsequently became a witness in behalf of the defendant, and testified to many communications made by the plaintiff to her. During the presentation of the plaintiff's testimony the wife made no objection to the revealment of her previous communications.

Our statute is prefixed with the declaration ''There are particular relations in which it is the policy of the law to encourage confidence, and to preserve it inviolate'': it then specifies communication between husband and wife as one of them, and provides:

''A husband shall not be examined for or against his wife without her consent, nor a wife for or against her husband without his consent; nor can either, during the marriage or afterwards, be, without the consent of the other, examined as to any communication made by one to the other during the marriage; but the exception does not apply to a civil action, suit, or proceeding, by one against the other, nor to a criminal action or proceeding for a crime committed by one against the other'';

■ We may be pardoned for observing, that it is difficult to understand how the policy of the law is facilitated by closing the mouth of either spouse in an action of this kind where an intruder is charged with having disrupted that which is the very foundation of the state, the home. It would seem rather as though the policy of the law should demand the widest possible inquiry into such charges. The plaintiff and Mrs. Coles are no longer husband and wife: the latter has now become wedded to the defendant. Certainly there can be no possibility of an injury to the relations existing between the plaintiff and his

former wife when their communications are published from the witness-stand. While husband and wife are living together happily, neither is likely to repose a greater confidence in the other through an assurance that in the event of an action of this character their communications cannot be revealed. Hence the defendant's objection is devoid of reason. We believe also that it finds no support in the well-established principles of law, for the following reasons: If the privilege of secrecy is the right of the defendant, then it would seem clear that he lost his opportunity of assigning error by failing to object when the communications were published from the witness-stand. It is only by taking the position that the privilege belonged to Mrs. Coles, who was not a party, that he can avoid the consequences of failure to object. But if he assumes the attitude that the privilege belonged to his present wife, he is brought face to face with the fact that such privileges are personal: *State ex rel. Heath* v. *Kraft,* 18 Or. 550 (23 Pac. 663) ; Wigmore on Ev. (2 ed.), § 2196. The probative value of a declaration previously made is neither increased nor diminished by granting to someone a privilege to exclude it from the witness-stand. The privilege is not based on any notion that the communication is untruthful, or would lack merit as evidence. Whether he exercises the privilege or does not, whether the court rules properly or improperly upon the claim of privilege, the relevancy, merit, and materiality of the declaration remains the same. It is true that a right of the privileged declarant has been violated when the court fails to protect it, and that amends should be made in some manner, but we fail to understand how redress will be brought to that party when a judgment between the two others is reversed because

of that erroneous ruling. We quote from Wigmore on Evidence (2 ed.), Section 2196, as follows:

"An improper ruling by the Court, upon a question of privilege, cannot be excepted to by the party as an error justifying an appeal and a new trial, if the ruling denies the privilege and compels the witness to testify. By hypothesis, the privilege does not exist for the benefit of the party nor for the sake of the better ascertainment of the truth of his cause. The offered testimony is relevant, and is, in all other respects than the privilege, admissible. The admission of it, by denying the privilege, has not introduced material which in any way renders less trustworthy the finding of the verdict; on the contrary, only the exclusion of it could have been an obstacle to the ascertainment of the truth. The only interest injured is that of the witness himself, who has been forced to comply with a supposed duty, which as between himself and the State did not exist; his remedy was to refuse to obey, and to appeal for vindication if the Court had attempted improperly to use compulsory process of contempt. This view has been accepted by some Courts. But the opposite view naturally possesses attraction for those Courts—and they are in the majority—who cannot evade the Anglo-Norman instinct to look upon litigation as a legalized sport, of orthodox respectability, with high stakes, the game to be conducted according to strict rules under judicial supervision, and to be won or lost according as these rules are observed or disregarded (*ante*, §§ 21, 1845). From this point of view, plainly, the trial Court's erroneous denial of privilege is a proper subject for exception and forms '*per se*' a reason for putting the opposing party, irrespective of the truth of the cause, to the delay, expense, and risk of a new trial. Upon the sporting theory of litigation there is no escape from this conclusion; though it is impossible to reach that conclusion upon any other theory. The sporting theory maintains thus far the upper hand, and by most Courts the

party is to-day allowed the right to except to a ruling erroneously denying a privilege.''

Our decision in *State ex rel. Heath* v. *Kraft, supra,* that the privilege is personal is in harmony with the reasoning of Dean WIGMORE; the spirit of our statutory law likewise contemplates the application of principles analogous to those quoted. Section 870, Or. L., in speaking of the privileges against self-incrimination and degradation, provides: ''This privilege is the privilege of the witness, and the objection cannot be made by a party or his attorney.'' Such being the situation, we believe the decision in *Thrasher* v. *State,* 92 Neb. 110 (138 N. W. 120, Ann. Cas. 1913E, 882), is helpful; the defendant was charged with the crime of rape; the girl was dead as the result of efforts to produce an abortion. To establish the defendant's guilt the state offered the testimony of the physicians who had attended the girl. We quote from the decision:

''Their testimony was objected to on the ground that it violated the law of privileged communications. The contention is based on the provisions of sections 333 and 334 of the code, which prohibit the disclosure of confidential communications to a physician, etc. The physicians testified to the physical facts discovered by them in their treatment of the decedent, and as to their course of treatment. We had never understood that the rule extended so far as is claimed by defendant. The testimony had no reference to him, and there was nothing for him to waive. The prohibitions of the section were not in his 'favor.' So far as we are aware, the provisions of the section have never been held to apply to cases of this kind, no authorities so holding are cited. Communications between patient and physician were not privileged at common law, but depend alone upon the statute. It

is to be applied only as between them, and is for the protection of the patient."

In *Davenport* v. *State*, 143 Miss. 121 (108 South. 433, 45 A. L. R. 1348) the defendant had been found guilty of manslaughter; he assigned error based upon the admission of the testimony of physicians who had attended the deceased after the infliction of the wound. The statute provided, "All communications made to a physician or surgeon by a patient under his charge or by one seeking professional advice, are hereby declared to be privileged and such physician or surgeon shall not be required to disclose the same in any legal proceedings, except at the instance of the patient." The prevailing opinion held "In other words, the defendant in the present case had no kind of rights growing out of the statute. It was not for him to be heard upon it. As to him, the evidence was competent and admissible, and no right of his was violated by the admission of the evidence." In *Lindsey* v. *People*, 66 Colo. 343 (181 Pac. 531, 16 A. L. R. 1250), one Bertha Wright had been charged with homicide, and this defendant was called as a witness to discredit the testimony of Neal Wright, her son. The defendant claimed that the communication had been made to him as a public official and that it was therefore privileged. From the prevailing opinion we quote:

"If the privilege existed at all, it existed for the protection of Neal Wright,—not for the benefit of plaintiff in error, or the defendant, Bertha Wright. * * It was a privilege which had to be claimed by Neal Wright or some one for him. If it could be claimed by him it could be waived by him and he had expressly waived it. It has been said that the proper person to claim or waive the privilege as to a minor is the natural guardian of such minor,—in this case

his mother. *State* v. *Depoister,* 21 Nev. 107 (25 Pac. 1000). Bertha Wright sat in court with her counsel at the time of the trial and attempted to claim the privilege as a defendant, which was clearly not her right. She made no attempt to make the claim as natural guardian of her son, and by her silence she waived it."

We believe that likewise in the case before us the privilege was in favor of the plaintiff and his former wife, and did not concern the defendant. No error affecting him was committed when the privileged communications were revealed. Upon the new trial, which will be necessitated by reason of the errors previously mentioned, the court must exclude these privileged communications if the possessor of the privilege invites such action; any court may very properly exclude privileged communications upon its own motion, when it appears that a witness is about to testify to some protected fact without a waiver of the privilege having been made: 10 Ency. of Ev. 200. The foregoing will also suffice to dispose of the contentions regarding the testimony of Mr. Motter.

The defendant argues in his brief alleged errors predicated upon the denial of his motions for a nonsuit and a directed verdict. We have carefully read the testimony covering over 500 pages. We deem it unnecessary to set forth a review of the evidence; the court did not err when these motions were denied.

We have carefully considered all other assignments of error. Believing that upon a new trial the situations which constitute the basis for these assignments are not likely to present themselves, we do not deem it necessary to comment upon them.

REVERSED AND REMANDED.

BELT, BROWN and RAND, JJ., concur.