Argued January 16; reversed February 13, 1945
# McKINNON *v.* CHENOWETH
(155 P. (2d) 944)

Before BELT, Chief Justice, and ROSSMAN, BAILEY, LUSK and HAY, Associate Justices.

*C. O. Fenlason,* of Portland, for appellant.

*L. A. Recken,* of Portland (Senn & Recken and Fred Gronnert, all of Portland, on the brief), for respondent.

LUSK, J.

This is an action to recover damages for the alienation of the affections of the plaintiff's wife. A jury trial resulted in a verdict and judgment for the defendant, and the plaintiff has appealed.

The plaintiff, A. G. McKinnon, and his wife, Vivian, were married January 29, 1939. In February, 1941, he and the defendant, Ray Chenoweth, both skilled mechanics and machine operators, formed a partnership to engage in the business of manufacturing, leasing and otherwise disposing of truck cranes of an improved type which McKinnon had perfected. The success of their venture is indicated by the fact that the net profit of the partnership before taxes for the year 1942 was $112,678.69. The partnership was dissolved early in February, 1943, at about the time of the final separation of the plaintiff and his wife.

There were several such separations. The first occurred on October 27, 1942, when Mrs. McKinnon, over

the plaintiff's protest, left their home in Portland and went to San Francisco. He heard from her twice by mail, and on November 12 joined her in San Francisco and they were reconciled. They returned to Portland, having first agreed that later they would go back and spend some time in the Bay area, the plaintiff having business there in connection with partnership machines under lease to the Bethlehem Steel Company in Modesto. Their trip was to be in the nature of a vacation. About November 20 they went to Modesto, stayed there one night, and then rented an apartment in San Francisco. On December 12 Mrs. McKinnon ordered the plaintiff out of the apartment. He returned to Portland, and about December 18 went to Oakland. On December 24 he saw his wife in her apartment in San Francisco, and they were again reconciled and spent the night of the 25th together in the Oakland Hotel. It was agreed between them that on the following day she was to go to San Francisco and pack her belongings and they would find living quarters in Modesto. Accordingly, on the 26th, Mrs. McKinnon went to San Francisco, but, after arriving there, telephoned the plaintiff that she had changed her mind and would not go to Modesto with him. She came back to Oakland, and, at her request, the plaintiff took her to the bus depot, where they parted. Thereafter the plaintiff endeavored to find his wife. He enlisted the help of Mr. and Mrs. R. E. Steelman, the former an employe of the partnership in Modesto, and on the evening of December 27 Mrs. Steelman reached Mrs. McKinnon by telephone at her apartment in San Francisco. Thereupon the plaintiff and the Steelmans went to San Francisco and there was another reconciliation. Mrs. McKinnon then went to Modesto with the Steelmans and rented an apartment where she and her hus-

band stayed until February 6, 1943. In the latter part of January the plaintiff made a trip to Portland from Modesto, saw the defendant, and' on February 4 they dissolved their partnership. The plaintiff returned to Modesto on February 6, and on that day his wife left him finally, informing him that "there was another man in the picture".

On March 4, 1943, the plaintiff was served with process in a divorce suit brought by his wife; he filed a cross-complaint and was granted a divorce on May 26, 1943. In the meantime, on January 21, 1943, the defendant's wife had filed suit for divorce, and on February 2 she was granted a decree.

There is little evidence in the record of any acts of the defendant prior to the first separation of plaintiff and his wife on October 27, 1942, which were the cause of their estrangement. But evidence of the subsequent conduct of the defendant was sufficient to make a jury question. Between November 3 and December 27, while Mrs. McKinnon was in California, the defendant many times called Mrs. McKinnon by long distance telephone from Portland and engaged in conversations of considerable length. On December 12, the day on which Mrs. McKinnon ordered the plaintiff out of their San Francisco apartment, the defendant arrived in San Francisco, and, until about December 18, stayed at a hotel in Oakland. During that period the plaintiff was in Portland.

On December 25 the defendant from Los Angeles sent a telegram to the plaintiff at the Oakland Hotel in Oakland reading as follows: "Circuits busy will leave in couple days". On the same day the defendant registered under the name of L. K. Jensen at the Hotel St. Claire in San Jose, which is 363 miles north of Los

Angeles and 48 miles south of San Francisco. He informed the hotel clerk that his wife would join him later, and, at the clerk's suggestion, added the words "and Mrs." to his registration. There is evidence to support a finding that once on December 25 and three times on December 26 and again on December 27, the defendant, under the name of Jensen, called Mrs. McKinnon's apartment in San Francisco by long distance telephone from the Hotel St. Claire. It was on December 26 that Mrs. McKinnon refused to carry out her arrangement to go to Modesto with her husband and disappeared until the evening of the 27th. The defendant testified that a woman was with him at the Hotel St. Claire in San Jose, but that it was not his wife. The plaintiff testified, without objection, that after his divorce his wife told him that she had seen the defendant at San Jose.

From the foregoing evidence the jury could have found that the defendant, intending to meet Mrs. McKinnon in San Jose, had wired the plaintiff as he did in order to deceive the plaintiff as to his movements, and that he did meet Mrs. McKinnon in San Jose and was instrumental in her failure to carry out her agreement with her husband to go to Modesto on December 26.

There is evidence that Mrs. McKinnon and the defendant agreed that he would use the name T. K. Jensen and she the name Vivian Lawson in communicating with each other and that they did so, and that during the month of January, 1943, the defendant, on numerous occasions and at considerable length, talked with Mrs. McKinnon over the long distance telephone from Portland and other points.

It was the defendant's theory that the breach between the plaintiff and his wife was brought about by his mistreatment of her, and other misconduct, and evidence was received which would have warranted a finding that that was the controlling cause of their estrangement.

Such further statement of the evidence as may be found necessary will be made in the course of our discussion of the assignments of error.

LUSK, J.

■ The plaintiff assigns as error the refusal of the court to give the following instruction:

"The Court further instructs the jury that in order to maintain an action for alienation of affection, it is not necessary that the plaintiff prove by the evidence that he had, at any time, the love and affection of his wife, because, under the law, a stranger has no right to voluntarily and unasked interfere with and disturb the concord and unity of the domestic relation or interfere or cut off any chance or possibility of a future affection springing up between the two spouses. The plaintiff had the right to seek the comfort, companionship, protection, aid and society of his wife without the interference of an outside person; even if you should find, from the evidence in this case, that the home life of the plaintiff and his wife was unpleasant, nevertheless this would not justify the defendant in voluntarily intermeddling with the plaintiff's domestic affairs, if he did so intermeddle, and if you find from the evidence, under the instructions of this court, that the plaintiff's wife would have lived and remained with him if it had not been for the wrongful acts, conduct and influence of the defendant, if any, and that the acts, conduct and influence of the defendant, if any, were naturally calculated to cause or contribute to causing plain-

tiff's wife to separate and remain apart from the plaintiff and so did, then your verdict will be for the plaintiff and against the defendant.''

■ The basis of the right of action for alienation of affections is thus explained by Mr. Justice HARRIS in *Pugsley v. Smyth,* 98 Or. 448, 459, 194 P. 686:

"Each spouse is entitled to the conjugal society, affections, and assistance of the other. A third person who intentionally alienates or entices one spouse from the other is generally liable to the latter. Loss of service is not the basis of the right of action, for pecuniary loss is not a necessary element; but the right to recover is based upon loss of consortium."

■ By consortium is meant "the right to the conjugal fellowship of the wife, to her company, cooperation and aid in every conjugal relation": *Bigaouette v. Paulet,* 134 Mass. 123, 124, 45 Am. Rep. 307, quoted with approval in *Jacobsen v. Siddal,* 12 Or. 280, 284, 7 P. 108, 53 Am. Rep. 360. See *Elling v. Blake-McFall Co.,* 85 Or. 91, 94, 166 P. 57; 12 C. J. 532; 42 C. J. S., Husband and Wife, 319, § 665.

■ In *Dodge v. Rush,* 28 App. D. C. 149, 152, 8 Ann. Cas. 671, Mr. Chief Justice Shepard, speaking for the court, said:

"The gist of the action for the alienation of affections is said to be the loss of *consortium,* that is, the loss of the conjugal fellowship, company, co-operation, and aid of the husband or wife. Loss of *consortium* is the actionable consequence of the injury, and alienation of affections is a matter of aggravation. (Citing authorities)

"While it is necessary to plaintiff's recovery in such an action to show that the defendant's misconduct was an effective cause of the loss of *consortium,* it is not necessary that it shall have been

the sole cause. Any unhappy relations that may have existed between the plaintiff and her husband, not caused by the conduct of the defendant, may affect the question of damages; but they are in no sense a justification or palliation of the defendant's conduct. (Citing authorities)''

The requested instruction is the same in substance as one approved in *Claxton v. Pool,* 182 Mo. App. 13, 167 S. W. 623, and embodies the correct rule of law as it has been enunciated by the courts in numerous decisions. *Morris v. Warwick,* 42 Wash. 480, 85 P. 42, 7 Ann. Cas. 687; *Mulock v. Ulizio,* 3 N. J. Mis. 631, 129 Atl. 204; *Dey v. Dey,* 94 N. J. L. 342, 110 Atl. 703; *Fratini v. Caslini,* 66 Vt. 273, 29 Atl. 252, 44 Am. St. Rep. 843; *Moelleur v. Moelleur,* 55 Mont. 30, 173 P. 419; *Hadley v. Heywood,* 121 Mass. 236; *Dodge v. Rush,* supra. See 2 Cooley on Torts (4th Ed.) 5, § 167; 30 C. J., Husband and Wife, 1126, § 985; 42 C. J. S., Husband and Wife, 322, § 672; 27 Am. Jur., Husband and Wife, 126, § 524, 137, § 537. In *Disch v. Closset,* 118 Or. 111, 117, 244 P. 71, this court quoted with approval the following from 30 C. J., Husband and Wife, 1126, § 984:

"The defendant will not be exonerated merely because he is less blamable than the injured spouse, and will incur liability by preventing a reconciliation between spouses estranged through the misconduct of one'';

and cited as well § 985, *ibid.,* where it is said that prior lack of affection cannot be interposed as a defense to the action for the alienation or enticement caused or brought about by defendant's acts or conduct. While there are a few apparently conflicting decisions, they do not, in our opinion, represent the weight of authority and cannot be reconciled with the basis of the right

of action as stated by this court in Pugsley v. Smyth, supra.

■ That the requested instruction was peculiarly applicable to this case is apparent, for the issue was presented whether Mrs. McKinnon had any affection for her husband capable of being lost, and the jury would have been warranted in finding that, notwithstanding such affection may have been wanting, a lasting reconciliation would have been effected had the defendant not persisted in pressing his attentions upon her. It was this theory, covered by the requested instruction, which the plaintiff was entitled to have submitted to the jury by the court, just as the defendant was entitled to an instruction that there could be no recovery if the plaintiff's own misconduct was the controlling cause of the alienation, and the court's refusal to give the requested instruction was reversible error.

■ Counsel for the defendant have not given us the benefit of any argument on the question of substantive law raised by the assignment of error under consideration. They assert in their brief that the defendant did not intermeddle; but we think that there is evidence that he did, and that it was for the jury to determine the fact. Counsel further say that the requested instruction is argumentative and that "this phase of the case and the law was covered by the general instructions of the court." We think there is no merit in the former suggestion. As to the latter, we are not referred to the particular portion of the instructions given by the court where the point is claimed to be covered, and, after a careful reading of all the instructions, we are unable to find that it is mentioned.

■ On a retrial it will be proper for the court to instruct the jury that want of affection on the part of

Mrs. McKinnon or any unhappy relations that may have existed between her and the plaintiff, not caused by the conduct of the defendant, may be considered in mitigation of damages.

The plaintiff requested, and the court refused to give, the following instructions:

"If you find from the evidence in this case, under the instructions given you, that the affections of plaintiff's wife were lost to him and that the acts and conduct of the defendant were a contributing controlling cause of the alienation, then your verdict will be for the plaintiff and against the defendant."

"The Court further instructs you that in a case of this kind it is not necessary for the plaintiff to show that the defendant's conduct was the sole cause of the alienation of his wife's affections, but it is sufficient, if you find from the evidence in the case, that the acts and conduct of the defendant were a contributing cause of the alienation."

"You are further instructed, in this connection, if you find from the evidence that the defendant is the entire cause of the alienation of affection of plaintiff's wife, he shall answer accordingly; if the defendant is only partially the cause of it, then he shall answer accordingly, although to a lesser degree than if he were wholly responsible."

The court instructed the jury as follows:

"If you find from the evidence in this case, under the instructions given you, that the affections of plaintiff's wife were lost to him, and that the acts and conduct of the defendant were intentional and the controlling cause of the alienation, and done with the intent to injure defendant, then your verdict will be for the plaintiff and against the defendant. The conduct of the third person need not be the sole cause, but it is sufficient if the third

person's conduct was the controlling cause which produced the estrangement, although there may have been other contributing causes.''

The court's action in refusing to instruct as requested and in giving the foregoing instruction is made the basis of one of the plaintiff's assignments of error. It is entirely clear that no error was committed in giving the instruction complained of, for it is the settled law of this state, as of most other jurisdictions, that in order for the plaintiff to recover in an action for the alienation of affections he must prove that the defendant's conduct was the controlling cause of the alienation, although there may be other contributing causes. The very cases cited by the plaintiff in support of this assignment of error so hold. *Disch v. Closset,* 118 Or. 111, 117, 244 P. 71; *Pugsley v. Smyth,* supra, 98 Or. at p. 459; *Saxton v. Barber,* 71 Or. 230, 235, 139 P. 334. To the same effect are *Aitkenhead v. Holmes,* 126 Or. 8, 10, 268 P. 765, and *Hughes v. Holman,* 110 Or. 415, 429, 223 P. 730, 31 A. L. R. 1108. It is true that this court has in certain instances refused to reverse judgments for the plaintiff where the trial judge had failed to instruct in so many words that the conduct of the defendant must be the controlling cause of the alienation. In *Saxton v. Barber,* supra, the court told the jury that it was not necessary to show that the defendant's conduct was the sole cause, ''but it is sufficient if you find \* \* \* that the wrongful acts of the defendant were a contributing cause of the alienation, etc.'' In passing upon the propriety of this instruction the court said:

''The instructions taken as a whole have the effect of telling the jury that defendant's conduct must have been the controlling cause of the alienation.''

In *Pugsley v. Smyth,* supra, the court said (98 Or. 459):

"The conduct of the third person need not be the sole cause, but it is sufficient if the third person's conduct was the controlling cause which produced the estrangement, although there may have been other contributing causes."

In that case the appealing defendant assigned as error the giving of the following instruction:

"It is not necessary, however, that the actions of the defendant shall be the sole and only cause of the alienation of the wife's affections. If it is a substantial and moving cause, without which the affections would not have been alienated, then the defendant is responsible in damages for his conduct in the matter."

The only criticism which the defendant made of the instruction was that it failed to state that "the appellant's actions must have been intentional", and the court held, that although the general charge given by the court was probably sufficient to cure the alleged defect, it would nevertheless be appropriate to suggest that upon a retrial the element of intention be made clearer to the jury.

In *Disch v. Closset,* supra, there was an instruction that the defendant "need not have been the sole cause, but if he contributed, then he must answer accordingly." This was followed by an instruction substantially in the language of the third of the requested instructions above set out. The court, after stating the prevailing rule that the defendant must be the controlling cause of the alienation, said (118 Or. 117):

"The instructions complained of would have been more accurately in accord with the law of this state if the learned circuit judge had used the word

'controlling' in the language quoted above, but in the light of the facts adduced, and taking the charge as a whole, the instructions quoted above were harmless, if error at all.''

■ It is apparent, therefore, that the decisions of this court are directly opposed to the plaintiff's contention that the instruction given by the trial judge was erroneous. Every proper element of the three requested instructions was covered by that instruction. It is one thing to say that a judgment will not be reversed because of a failure to use the most appropriate language in an instruction when the court can find from the charge as a whole that the correct rule of law has been conveyed to the jury. It is quite a different thing to say that failure to give a requested instruction which does not use the most appropriate language—and, indeed, is erroneous, as are the second and third requests under consideration—is ground for reversal, notwithstanding that the trial judge has informed the jury of the correct rule of law and in the very words which this court has declared to be ''more accurately in accord with the law of this state'': *Disch v. Closset,* supra.

■ The third of the requested instructions, to the effect that if the defendant is the entire cause of the alienation he shall answer accordingly, and if he is only partially the cause of it he shall answer accordingly, although to a lesser degree, is not the law, in our opinion. In so far as Disch v. Closset, supra, seems to approve such an instruction that case is overruled. The instruction confuses the question of damages with that of the cause of the alienation. The argument for it on the part of the plaintiff invokes some doctrine of comparative fault in analogy to the doctrine of com-

parative negligence in another branch of the law. We have been referred to no decisions or text enunciating such a doctrine. Under this theory the rule of controlling cause would be thrown into the discard and the jury would be authorized to find for the plaintiff if the defendant's conduct contributed in some degree to the alienation, even though the controlling cause was the misconduct of the plaintiff. That would be to overrule every decision in this state on the subject, with the possible exception of *Disch v. Closset,* supra. But even in that case, it can scarcely be said that the court expressed approval of the instruction in question. The court said that "in the light of the facts adduced, and taking the charge as a whole, the instructions quoted above were harmless, if error at all." This is but half-hearted, if any, approval, and it would be rash to contend that the court would have held the refusal to give such an instruction erroneous and ground for reversal.

■ In this connection it will bear repeating that misconduct of the plaintiff husband will not palliate the offense of the enticer, although domestic unhappiness and discord, not brought about by the defendant, may serve to mitigate the damages.

■ The assignments of error next to be considered are based upon ruling of the court sustaining the defendant's objections to evidence offered by the plaintiff of statements or declarations made by Mrs. McKinnon out of the presence of the defendant. They fall into two general classifications. Some were communications made by Mrs. McKinnon during the marriage to the plaintiff—no one else being present—, and were sought to be proved by the plaintiff's testimony. Others were declarations made to third parties.

As to the former it is clear that the court ruled correctly, for it is settled by *Pugsley v. Smyth,* supra, 98 Or. pp. 468-480, that § 3-104, O. C. L. A., which provides that neither a husband or his wife "during the marriage or afterwards, (may) be, without the consent of the other, examined as to any communication made by one to the other during the marriage", applies in actions for the alienation of affections and is intended to cover all such communications, whether confidential or otherwise, unless consent that the communication be revealed is either expressed or implied.

Counsel for the plaintiff relies upon *Coles v. Harsch,* 129 Or. 11, 276 P. 248, and quotes the following from the opinion in that case at page 26 of the report:

> "We may be pardoned for observing, that it is difficult to understand how the policy of the law is facilitated by closing the mouth of either spouse in an action of this kind where an intruder is charged with having disrupted that which is the very foundation of the state, the home. It would seem rather as though the policy of the law should demand the widest possible inquiry into such charges."

The foregoing dictum seems to be out of harmony with what was said on that subject in *Pugsley v. Smyth,* but the decision itself does not support the plaintiff's position. The situation presented by the record in *Coles v. Harsch* was the converse of that in the instant case. There, evidence of communications made by the wife to her husband, who was the plaintiff in an action for alienation of affections, was received without any objection whatever. On appeal from a judgment in favor of the plaintiff the defendant contended that the reception of this testimony was reversible error. The court held that the privilege was that of

the plaintiff and his former wife and did not concern the defendant, and that no error affecting him was committed when the privileged communications were revealed (129 Or. 31). Inasmuch as other errors necessitating a reversal had been committed on the trial, it was added that upon the new trial "the court must exclude these privileged communications if the possessor of the privilege invites such action; any court may very properly exclude privileged communications upon its own motion, when it appears that a witness is about to testify to some protected fact without a waiver of the privilege having been made: 10 Ency. of Ev. 200." In this case the plaintiff, the party who offered the testimony, is complaining because it was excluded. Under *Coles v. Harsch* the court was authorized to exclude evidence of such communications, notwithstanding the fact that Mrs. McKinnon made no objection to its admission. There is nothing in that case to suggest that the refusal of the court to receive evidence which the statute makes incompetent should be regarded as error.

■ It is suggested that Mrs. McKinnon waived the privilege because she was in the courtroom during the trial and did not claim it. But, under the terms of the statute, she was not required to claim the privilege, for, without her "consent" her husband was not permitted to be examined concerning the communications. And mere silence on her part did not amount to a waiver. *Pugsley v. Smyth,* supra, 98 Or. at p. 465; 70 C. J., Witnesses, 464, § 631.

■ The question of the admissibility of the declarations of Mrs. McKinnon to third persons depends upon whether or not such declarations fall within any of the exceptions to the rule excluding hearsay evidence.

In this class of cases "the general rule is that declarations of the deserting wife, though made in the absence of the defendant, are available as evidence in behalf of the injured husband to prove the state of the affections of the alienated wife, her motive, and the effect produced upon her mind by the conduct of the defendant, notwithstanding such declarations involve statements of acts done or words spoken by the defendant." If, however, "the utterance is nothing but a recital or narrative of what has been done or said, and is not the spontaneous and natural manifestation of the then existing emotion which inspired and produced it, then it does not come within the reason of the rule and is not admissible." *Pugsley v. Smyth,* supra, 98 Or. at p. 462, and cases there cited. See, also, *Mumper v. Webster,* 137 Or. 554, 557, 3 P. (2d) 753, 82 A. L. R. 222; *Coles v. Harsch,* supra, 129 Or. at p. 21; *Disch v. Closset,* supra, 118 Or. at p. 114; *Coates v. Slusher,* 109 Or. 612, 623, 222 P. 311; *Cole v. Johnson,* 103 Or. 319, 340, 205 P. 282.

The application of the foregoing principles is involved in the following instances:

The witness, Inez Steelman, testifying as to her telephone conversation with Mrs. McKinnon on December 27, was asked to state what was said. Defendant's objection to the question was sustained, and the plaintiff offered to prove that Mrs. McKinnon said over the telephone "that she wanted to come back to Mac if Mac would have her." We think that the evidence should have been admitted, although, in view of the fact that it was shown that she did go back to her husband, its exclusion was probably harmless and not reversible error.

██ Inez Steelman testified that she had a conversation with Mrs. McKinnon during the time that the Steelmans and McKinnons were living at Modesto, and was asked "Can you state whether or not, during that conversation, anything was said with respect to Vivian having been in San Jose?" An objection on the ground that the question was leading and suggestive was sustained. The offer of proof was as follows:

"That Vivian told her that she didn't love nor care for Mac, but did love and care for Chenoweth, and that she, Vivian, had met with Chenoweth in San Jose, and that he had promised to so arrange that there would be a divorce between him, Chenoweth, and his wife, and that they, Chenoweth and Vivian, agreed that Vivian should get a divorce, and that he, Chenoweth, would take steps to break up the partnership and that she, Mrs. McKinnon, and Chenoweth, would later marry."

In our opinion the question was not leading, but the only portion of the offer of proof which would have been admissible under any circumstances was "that Vivian told her that she didn't love nor care for Mac, but did love and care for Chenoweth", and that would not have been responsive to the question. The remainder was all a narrative of past events and inadmissible.

██ Inez Steelman testified that during the time they were living in Modesto Mrs. McKinnon from time to time asked for mail addressed to Vivian Lawson at the general delivery window of the post office, and that on one occasion she was present when Mrs. McKinnon received a letter so addressed, and that she (the witness) read the letter and recalled its substance. She was then asked "Will you tell, please?" An objection to the question was sustained and the offer of proof was: "She will testify that in that letter—that she

read the letter—and that it rather expressed love and affection to Vivian Lawson, and Vivian told her that that was from Chenoweth''. The objection to the testimony was properly sustained because the proposed evidence that ''Vivian told her that that was from Chenoweth'' was purely hearsay. Beyond that no proper foundation was laid for the introduction of secondary evidence.

■ The witness, Carl Vortman, testified that in the forepart of the year 1943 he and his wife were in Mrs. McKinnon's room in the Imperial Hotel in Portland at a time when Mrs. McKinnon engaged in a long distance telephone conversation in which she was heard to ask ''where the shovels were working'', and, during the course of the conversation, used the word ''honey'' and at its close said ''goodbye, darling''. The witness was asked ''Now, what, if anything, did Vivian state, after this conversation was terminated?'' An objection was sustained, and the plaintiff offered to prove that Mrs. McKinnon said that she had been talking to Ray Chenoweth, and that she did not let the Vortmans talk to Ray because Ray had instructed that there be no one present when he called to talk to her. The ruling was obviously correct, for here was no spontaneous expression manifesting a state of mind, but a mere recital of things that had occurred and words that had been spoken.

■ For a like reason the court was right in excluding testimony sought to be elicited from the witness Inez Steelman that Mrs. McKinnon told her that a new piece of jewelry which Mrs. McKinnon was wearing was given to her by the defendant as a Christmas present.

■■ The next instance is governed by a somewhat different rule. There was evidence that on November

15, 1942, the defendant was registered for one day at the Roosevelt Hotel in Portland. Inez Steelman testified that on that day she drove Mrs. McKinnon downtown at the latter's request. She was asked: "and did she tell you where to take her?" An objection to the question was sustained, but the witness nevertheless answered: "She said she was going to the Roosevelt hotel to see a friend." On motion the answer was stricken. We think that the answer should have been permitted to stand, under the rule laid down in *State v. Farnham,* 82 Or. 211, 250, 161 P. 417, Ann. Cas. 1918A 318, "that, when the question is whether a person did a certain act, his declarations, oral or written, made prior to and about the time he is alleged to have done an act, to the effect that he intended to do it, are admissible as original evidence, if made under circumstances precluding any suspicion or misrepresentation." See 6 Wigmore on Evidence (3d Ed.) § 1725, and numerous cases cited in the notes. One of the questions for the jury's consideration in this case was whether the defendant was meeting clandestinely with Mrs. McKinnon, and her declaration that she was going to meet a friend at the Roosevelt Hotel, made at a time when the defendant was a guest at that hotel and under circumstances which offered no reason for believing that she was not truthfully disclosing her intention, was evidence upon that issue. The ruling of the court excluding the testimony was, in our opinion, erroneous.

■ The manager of the Palace Hotel in Portland, called as a witness by the plaintiff, produced and identified registration cards showing that on various dates between April 20, 1942, and October 27, 1942, "T. K. Jensen" registered at that hotel. L. K. Jensen, it will be recalled, was the name used by the defendant when he registered at the Hotel St. Claire in San Jose,

California, on December 25, 1942, and T. K. Jensen was the name which the defendant and Mrs. McKinnon agreed would be used by them in their communications with each other. It was shown that on some of the days when T. K. Jensen was registered at the Palace Hotel the plaintiff was out of the city, and that the last of such registrations was on October 27, when Mrs. McKinnon left her husband and went to San Francisco. The registration cards did not bear the name of any hotel. The defendant admitted in effect that he signed them with the name T. K. Jensen and that he was staying at some hotel in Portland on the dates which they bore, but claimed that he did not know or could not remember the name of the hotel. The plaintiff offered the registration cards in evidence, but the court refused to receive them, and the ruling is assigned as error.

The question whether the rejected evidence had legal relevancy depends upon whether, in view of the circumstances mentioned and the further fact that Chenoweth had a home in Portland, an inference would have been warranted that the defendant and Mrs. McKinnon met clandestinely at the Palace Hotel on the occasions in question. Whatever suspicion might be created by the evidence, we think that it is so remote and speculative in character that the ruling complained of was not reversible error. There is no evidence of any kind that Mrs. McKinnon was ever in the Palace Hotel, and, if it is to be assumed that the defendant registered there under an alias with some unlawful or immoral design, it might perhaps as well be assumed that some other woman than Mrs. McKinnon was involved. In any event, the only evidence excluded was the registration cards, and the jury had before it the fact that on certain days when the plaintiff was out of the city

98

the defendant did in fact register under an alias at the Palace Hotel. For whatever it was worth, the plaintiff had the benefit of this evidence.

■ When the question of privileged communications between husband and wife first arose and the court sustained the defendant's objection to a question put to the plaintiff regarding a statement made to him by his wife during the marriage, counsel for the plaintiff requested the court to "inform this jury as to the rules of evidence applying to the oral communications between husband and wife". The court's denial of this application is assigned as error. It is said in support of the assignment that "the jury should have been enlightened, not kept in the dark." We can see no merit whatever in this contention. It is the duty of the court in its charge to "enlighten" the jury as to the law applicable to evidence legally received, and, in some instances, to instruct the jury at the time of the reception of evidence as to some limited purpose for which it is admitted. But it is none of the jury's concern why the court excludes evidence. If it were so, then not only in the case of privileged communications, but in every other instance where proffered testimony is rejected, the court would be called upon to state to the jury the reasons for its rulings. This would accomplish nothing of good, and its tendency would be to bring about confusion in the minds of the jurors. No authority has been cited for the plaintiff's contention, and we doubt that any exists.

■ As his first witness plaintff called to the stand the defendant, and, before proceeding to examine him, made the following statement to the court:

"May it please the court, I desire the record to show that this party is called as an adverse wit-

ness and he is called under the rights accorded by Sec. 4-709, as amended, and I ask the Court now to instruct, in view of that section, that I don't vouch for the credibility of this witness nor am I bound by his testimony."

The court ruled as follows:

"I will not at this time advise the jury that counsel's client is not bound by the testimony given by this witness. I will instruct the jury, in the words of the statute, that he does not vouch for him. I will, if offered, consider, if occasion arises, the matter of impeachment of the witness in accordance with the provisions of the statute. I will, later, during the trial of this case, reconsider, at counsel's request, the suggestion to instruct the jury in accordance with his present request, that is, to the effect that his client is not bound by the testimony of this witness. This will give the court an opportunity to become fully advised as to whether or not such ruling is in order. I will allow an exception."

The plaintiff assigns the ruling as error. Section 4-709, O. C. L. A., reads:

"The party producing a witness is not allowed to impeach his credit by evidence of bad character, but he may contradict him by other evidence, and may also show that he has made at other times statements inconsistent with his present testimony, as provided in section 4-712; provided, that when a party calls as a witness either an adverse party or the assignor, agent, officer, or employe of an adverse party, (he) shall not be deemed to have vouched for the credit of such witness and he may impeach the credit of such witness in the same manner as in the case of a witness produced by an adverse party."

The proviso of the foregoing section came into our law by an amendment adopted in 1937, Oregon Laws

1937, Ch. 23. Before the amendment a party calling his adversary as a witness thereby "vouched" for his credibility. That is the language of many of the decisions of this court: *Maupin Warehouse Co. v. Fleming*, 121 Or. 531, 537, 255 P. 606; *Sitton v. Peyree*, 117 Or. 107, 123, 241 P. 62, 242 P. 1112; *Chance v. Graham*, 76 Or. 199, 203, 148 P. 63. As otherwise expressed in *State v. Steeves*, 29 Or. 85, 103, 43 P. 947: "When a party producing a witness calls him to the stand he thereby represents him to the court as worthy of credit, or at least not so infamous as to be wholly unworthy of it."

The amendment of 1937 was enacted in order to relieve a party calling his adversary to the stand of this burden and to "permit a party to call an adverse party * * * for examination as on cross-examination": 70 C. J., Witnesses, 604, § 778. Its purpose is "to enable a litigant to call his adversary without making him his own witness and elicit from him, if possible, material facts within his knowledge": 70 C. J., *ibid.;* and the legislature, in using the word "vouch" in the statute, may be assumed to have had in mind the meaning of that word as used in the decisions of this court. It did not use the word "bound", which we take to mean the same thing as "concluded". By advising the jury that the plaintiff did not vouch for the credibility of the defendant, the court in effect told the jury that the plaintiff did not represent him as worthy of credit. The court did not by that instruction, as counsel for the plaintiff extravagantly contends, inform the jury that the plaintiff *was* bound by his testimony. That would be as though the court had determined in advance that the plaintiff would not even be permitted to contradict or impeach the witness. The court neither

expressed nor implied any such view, and, in fact, counsel for the plaintiff was permitted to examine the defendant freely ''as if on cross-examination'' and to offer evidence in contradiction of his testimony. The instruction given by the court was all that the plaintiff was entitled to under the statute. In ordinary circumstances, indeed, we think that the court would have discretion to refuse to instruct upon the subject at all, though it is conceivable that situations might arise, such, for example, as a contention urged before the jury that a party did vouch for his adversary whom he had called as a witness, which would make such an instruction not only proper but necessary.

There are no other assignments of error. On account of the errors committed on the trial the judgment will be reversed and the cause remanded for further proceedings in conformity to this opinion.