Argued and submitted February 15, reversed and remanded with instructions
July 26, petition for review denied October 17, 1995 (322 Or 193)

Thomas L. HOLMES
and Diane R. Holmes,
*Respondents,*

*v.*

N. Carlene MORGAN,
*Appellant,*
*and*

AID ASSOCIATION FOR LUTHERANS,
and Kendra Holmes,
*Defendants.*

(92-2439-L-1; CA A82337)

899 P2d 738

Sandra Sawyer argued the cause for appellant. With her on the briefs were Mark D. Clarke and Frohnmayer, Deatherage, Pratt, Jamieson, Turner & Clarke, P.C.

Joseph M. Charter argued the cause for respondents. With him on the brief was Werdell, Charter & Hanson.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

De MUNIZ, J.

**De MUNIZ, J.**

Forrest Holmes was the eldest son of plaintiffs Thomas and Diane Holmes. In the spring of 1991, while attending Southern Oregon State College, he revealed to his parents that he was homosexual. In June 1992, he committed suicide. Following his death, plaintiffs brought this action against Carlene Morgan (defendant).[1] They alleged two claims. The first was for a declaratory judgment that the change of beneficiary on Forrest's insurance policy to defendant violated public policy as part of an oral contract to assist Forrest in committing suicide. The second was for interference with economic relations. Defendant appeals the judgment following a jury's verdict in favor of plaintiffs on both claims. We reverse.

■  On appeal from a jury verdict, we view the evidence in the light most favorable to plaintiffs, the prevailing party. *Moini v. Hewes*, 93 Or App 598, 600, 763 P2d 414, *rev den* 307 Or 245 (1988). The parties presented completely conflicting evidence. Defendant's evidence gave the following version of the facts. When defendant and Forrest first met in July 1990, he was confused about his sexuality but thought that he was homosexual. Forrest began stopping by defendant's house, confiding his personal problems to her. Their relationship was not romantic.

On learning that Forrest was homosexual, his father became furious and told Forrest that he had disinherited him. Plaintiffs told Forrest that he had to move out of their house and that he was to call them "Tom and Diane," instead of "Dad and Mom." Forrest and defendant, who is a registered nurse, agreed that Forrest would rent a room in defendant's home for about three months.

During this time, Forrest was suicidal because of his concerns over his homosexuality and the difficulties with his parents. Defendant testified that she counselled Forrest and that they agreed that she would not have him committed to a

---

[1] Plaintiffs also named as a defendant the Aid Association for Lutherans (AAL), which had issued the $50,000 insurance policy involved in this action. AAL joined defendant Kendra Holmes, the second beneficiary of the policy. AAL deposited the insurance proceeds with the court and a judgment of dismissal was entered. A default judgment was entered against Kendra. Defendants AAL and Kendra Holmes are not parties to this appeal.

mental facility for his own safety if he would take certain steps to improve his mental health.

While living at defendant's home, Forrest told defendant about his insurance policy and that his parents had told him that he could not change the beneficiary. Defendant advised Forrest to talk to his insurance agent. In September 1991, Forrest met with an insurance agent and, without defendant's knowledge, he changed the beneficiary from his parents to defendant as primary beneficiary. Forrest never told defendant about the change.

On October 8, when Forrest did not get up, defendant checked on him, and he appeared to be asleep. Defendant went to work, but later that morning she began to worry about Forrest. She called Diane and, on learning that Forrest had not met his mother as he customarily did, defendant told Diane to go to her house and see if Forrest was all right. When Diane arrived, Forrest was in a coma. Defendant immediately went to the house, and began emergency medical procedures while an ambulance was summoned.

Forrest was hospitalized in serious condition with pneumonia. Defendant's position is that there was no admissible evidence that Forrest's condition was the result of a suicide attempt. Drug and alcohol tests were negative. His treating physician opined that Forrest had probably vomited and aspirated the secretions, setting up pneumonia. After his release from the hospital, Forrest moved for a time to Salt Lake City and then returned to his parents' home, where he committed suicide by shooting himself.

Defendant was surprised when she was notified that she was the beneficiary of the policy, and at first declined to sign the forms because she thought Forrest's parents would be unhappy and she wanted to consult an attorney. About two weeks later, she filed for the proceeds. After being notified that defendant was the beneficiary, Diane related that she had had a telephone conversation with Forrest on September 18, 1991, the day after he had changed the beneficiary. Forrest had told her that he changed the beneficiary because he and defendant had entered into an agreement whereby she would assist him in committing suicide in return for his making her the beneficiary of his insurance policy. Diane had

not previously told anyone of the agreement: She had not mentioned it to her best friend, Martha Sundberg, to the family doctor, Forrest's counsellor, the police, paramedics or emergency room personnel. She had not confronted defendant about the alleged pact, even when they were with Forrest when he was found unconscious.

Plaintiffs' evidence presented a totally different version of the events. On learning that their son was homosexual, they were upset, but they loved him and wanted to work through the issue. Forrest moved from the family home because he wanted to after he graduated. Diane continued to see her son almost daily. On September 18, 1991, she received a telephone call from Forrest. He had been drinking. He said that he wanted to commit suicide and that defendant had agreed to help him by obtaining prescription drugs. Defendant had also agreed to bury Forrest in her family's plot and to buy him a large green marble headstone. In payment, he had agreed to name defendant as the beneficiary on his life insurance policy, which his parents had purchased when he was a baby and had turned over to him when he went into the military.

Diane was upset about the suicide plan and made arrangements for Forrest to begin counselling. Forrest went to see Dr. Walters. Forrest had been drinking, and defendant had told him to take a drink before going to see Walters. Walters prescribed the antidepressant Trazadone, which enhances the effect of alcohol. Death may occur when it is ingested with other drugs. Forrest also saw Dr. Mersch, who prescribed the sedative Xanax, which has serious side effects when taken in combination with alcohol, including lethargy and decreased respiration. Xanax disappears fairly quickly from the body and the other two prescriptions drugs Forrest was taking, Hydroxyzine and Trazadone, would not show up on typical drug screens.

On October 8, defendant called Diane and told her that there was to be a cable installation at defendant's residence that day. Defendant asked Diane to check on Forrest, because he had been asleep when defendant had left the house. When Diane did so, she found him asleep and unresponsive. Defendant returned to the residence, and an ambulance was called. While at defendant's home, Diane answered

a telephone call from the cable company confirming that the installation was for the next day. At the hospital, defendant told Diane that defendant had a power of attorney signed by Forrest and that defendant did not have to allow any lifesaving measures to be performed. While Forrest was living at defendant's home, she advised him to make a will and a power of attorney, as well as to talk with his insurance agent.

Defendant told the doctors at the hospital that Forrest had been partying with friends the previous evening and that she had checked on him at midnight. When plaintiffs returned to the hospital the day after Forrest had been admitted, he wrote them a note in which he stated, "I blame Carlene."

The treating physician testified that Forrest's pneumonia could have been caused by a drug overdose from sedative drugs. The "whole process" of his condition could be explained by excessive alcohol use, leading to inebriation, vomiting, ingesting the vomit, resulting in pneumonia. The alcohol could have worked out of Forrest's system by the time he was tested.

After release from the hospital, Forrest moved back home with his parents until November 1. On October 21, he began counselling with Dr. Oas, a clinical psychologist. Oas testified that Forrest had related that he had a suicide pact with defendant, that the October incident was "like a dry run," and that he did not want to see defendant under any circumstances. Diane was aware of only one contact between Forrest and defendant after his release from the hospital. Forrest told Diane that he was trying to get defendant to repay him for a charge on his credit card that was a part payment for her assistance in helping him to commit suicide.

Forrest confided to his mother that he had attempted suicide. He said that he didn't tell anyone at the hospital because he was afraid he would be kept there. He told Diane that defendant had said it was easy to take pills and then just go to sleep. Forrest also told Diane that he didn't want to see defendant again and that defendant was a bad influence on him.

Diane testified that she did not tell anyone about the suicide plan, because Forrest had asked her not to and

because defendant would not be a threat if Forrest changed his mind about suicide. She testified that he was a 26-year-old adult who was capable of making his own choices regarding his friends.

■      Defendant's first assignment of error is that plaintiffs' complaint failed to state a claim, because they lack standing to bring the action. She contends that plaintiffs never acquired an interest in the insurance contract but are trying to create one by declaring the contract void.[2] She argues that plaintiffs were not third-party beneficiaries and were, at the most, third-party donee beneficiaries. Therefore, she contends, their rights under the insurance contract would not vest until Forrest's death. *See Duty v. First State Bank of Oregon*, 71 Or App 611, 617, 693 P2d 1308, *rev den* 278 Or 822 (1985) (beneficiary of life insurance policy in which insured reserves the right to change the beneficiary does not have a vested interest in the proceeds before the death of the insured).[3]

Plaintiffs argue that they did not have to be parties to the contract to have an interest in it. They cite 5 Couch, *Cyclopedia of Insurance Law*, § 28.103, at 204-05 (1984):

"By majority rule, where a change of beneficiary has been accomplished by * * * undue influence practiced by the substituted beneficiary, the rights of the original beneficiary are not cut off by the attempted substitution. Equity may entertain jurisdiction of a suit by an original beneficiary to set aside the change to a substituted beneficiary on the ground of * * * undue influence and to enjoin the payment of the policies to the latter. The original beneficiary may also sue the second beneficiary for damages, or charge the second beneficiary as constructive trustee of the proceeds."

In *Roberts v. State Tax Commission*, 229 Or 609, 614, 368 P2d 342 (1962), the Supreme Court recognized the rights of a donee beneficiary. It stated that the rights come

---

[2] Defendant alleged plaintiffs' lack of standing in a motion to dismiss for failure to state a claim and then as an affirmative defense in her answer to plaintiffs' fourth amended complaint.

[3] Defendant is wrong that "there is nothing in the pleading that would obviate the rights of the successive donee beneficiary, Kendra Holmes, from becoming the primary beneficiary." She was served, and a default judgment was entered against her.

into being when the contract is executed, and although the vesting of such rights may be postponed, nonetheless the beneficiary obtains an immediate, although defeasible, interest that the law will recognize and protect to the extent required by the circumstances of the case. In their interference with economic relations claim, plaintiffs, as donee beneficiaries, state a legally recognized interest, which they allege defendant interfered with by undue influence.

■        Plaintiffs also could bring their declaratory judgment claim. Standing to bring a declaratory judgment proceeding does not depend on the direct involvement of the plaintiff with the defendant. *Morse Bros. Prestress v. City of Lake Oswego*, 55 Or App 960, 963, 640 P2d 650 (1982). The proper question is whether the plaintiff has alleged an affect on some legally recognized interest great enough to assure an adversary proceeding sufficient for adequate presentation of the issues. *Id.* at 964. Here, plaintiffs alleged that Forrest and defendant entered into an oral contract by which defendant was to assist Forrest in taking his life, in exchange for defendant being named the primary beneficiary of the insurance policy. They further alleged that, pursuant to the oral contract, Forrest changed the beneficiary designation from them to defendant. Plaintiffs' complaint alleges an actual controversy relating to the legal rights and duties of the parties sufficient to make a claim for declaratory judgment. *Goose Hollow v. City of Portland*, 58 Or App 722, 726, 650 P2d 135 (1982).

Defendant filed a motion *in limine* to exclude from evidence statements made by Forrest.[4] Defendant's next three assignments of error, treated collectively, are to the denial of her motion and the admission of testimony by Diane

---

[4] Pursuant to OEC 803(25) and OEC 804(3)(f), plaintiffs gave notice that they intended to offer statements made by Forrest. Both statutes require that the hearsay statement to be offered may not be admitted unless the proponent makes known the intention to offer the statement "and the particulars of it * * * sufficiently in advance of the trial * * * to provide the adverse party with a fair opportunity to prepare to meet it." We do not agree with defendant that the notice requirement was not met here. Plaintiffs provided one month's notice, and the notice was given in advance of Diane's deposition. Defendant had a "fair opportunity" to inquire into what statements Forrest had made in order to prepare to meet that evidence.

and Oas, the clinical psychologist, regarding Forrest's statements. Defendant argues that Forrest's statements do not come within an exception to the hearsay rule and that admitting them was clearly prejudicial, because it allowed plaintiffs to prove their case by hearsay evidence that could not be tested by cross-examination.

■ We turn first to Diane's testimony regarding the September 18, 1991, telephone conversation.[5] Plaintiffs

---

[5] She testified:

"Q. Did you receive a phone call from your son somewhere around September 18th?

"A. Yes. * * *

"Q. Was there anything unusual about Forrest when he called you?

"A. Well I felt that Forrest had been drinking when he called me; he sounded very agitated and he slurred his words a little bit, he was talking fast, very fast and saying a lot of things that were not like him.

"Q. Did he say anything to you about being unhappy or what his plans were? * * *

"A. As I recall the first thing he said to me was, 'Mom, I'm really unhappy with my life, I have decided I want to commit suicide. I have a friend here in Carlene and she has agreed to help me.' He talked for a long time, and I'm not sure you want me to —

"Q. Did he tell you or explain to you anything about how she was going to help?

"A. He said that Carlene was helping him to obtain prescription drugs so that he could save up enough and use them in a combination that would cause him to go to sleep and not wake up.

"Q. Did he indicate anything to you regarding any conversations about how his death would appear, when he was found?

"A. Yes, he said he wanted the death to appear as an accident. He said, 'you know I'm going to act like this was something accidental, Carlene knows how to take the drugs and she knows things can be taken together so that after you're dead they can't tell what it was that you took.' He said, 'I especially need for this to look like an accident because I've put Carlene as the beneficiary on my life insurance policy and I want to be sure that she gets the payment and if it appears that I did commit suicide the insurance policy will probably not pay.' He said, that in payment for her advice he had charged a leather couch and loveseat on his credit card which she has in her house, that he had agreed to take her on a cruise in December sometime and that he was letting her have the money from his life insurance policy.

"Q. Did your son tell you anything about whether he had had any conversations with the defendant, Carlene Morgan, regarding his funeral or his burial?

"A. Yes, he had said that he and Carlene had talked at length about some of the things that she would do with the money that she got from the life insurance policy. He said one of the things that she wanted to do for him was to bury him in her family's plot. She was going to buy him a large green marble tombstone with a big pink triangle on the top. She was going to fund an organization that would help other young gay males feel good about themselves and that's the reason that he wanted her to have the money

argue that Forrest's statements were admissible as statements of independent legal significance and, therefore, are not hearsay. Plaintiffs' position is that, because defendant admitted that there was an agreement between her and Forrest, the dispute in the case is "merely" over the terms of the agreement, and Forrest's statements about those terms are not hearsay. *See Creaghe v. Iowa Home Mutual Casualty Co.*, 323 F2d 981, 984 (10th Cir 1963) (hearsay rule does not exclude testimony as to what the contracting parties said with respect to the making or the terms of an oral agreement).

The dispute here is not merely over the terms of an agreement. The agreement that defendant admitted having with Forrest was that she would not have him hospitalized if he obtained counselling. That is qualitatively different from the agreement alleged by plaintiffs, which defendant denied having made. Moreover, we agree with defendant that, although the hearsay rule does not exclude testimony about what contracting parties said, that testimony must come from the parties to the agreement or from a third party who actually heard the parties. Here, Diane was neither a party to the agreement nor one who heard the parties make the agreement, and Forrest's statements were offered for the truth of the matter asserted. Forrest's statements were hearsay.

The basis for the trial court's allowance of Diane's testimony is not clear. Before addressing OEC 804(3)(f), the residual exception to hearsay, plaintiffs urge that the statements come within other hearsay exceptions, which are grounds for affirming the trial court's ruling.

---

because the name of the organization would be named after him and it would be a memorial to him. * * *

"Q. Did he give you any indication of when it was that he thought he would have his suicide?

"A. He said that he and Carlene had picked the date of January 5th for the suicide, he said, 'You know, I've always liked Christmas and I want one more Christmas with you before I die.' He said, toward the end of the conversation, he said, 'Now, maybe you can make me change my mind Mom and if you can make me happy between now and then perhaps I'll change my mind.' He also said, 'Now don't tell Dad that you've talked to me about this or you'll be sorry.'

"Q. What did you do?

"A. Well I was so upset, after I hung up I think I just sat in the kitchen and just cried and prayed, and I didn't really know what to do. * * *"

Plaintiffs first argue that the statements were admissible under OEC 803(3) as statements of Forrest's "existing state of mind * * * such as intent [or] plan * * *." They rely on *McKinnon v. Chenoweth*, 176 Or 74, 96, 155 P2d 944 (1945), quoting from *State v. Farnham*, 82 Or 211, 250, 161 P 417 (1916):

" '[W]hen the question is whether a person did a certain act, his declarations, oral or written, made prior to and about the time he is alleged to have done an act, to the effect that he intended to do it, are admissible as original evidence, if made under circumstances precluding any suspicion or misrepresentation.' "

The issue here, however, is not whether Forrest committed suicide. Instead, the issue is whether defendant agreed that she would assist Forrest in committing suicide in exchange for being made the beneficiary of Forrest's insurance policy.

The legislature did not intend OEC 803(3) to permit the use of a "declaration to prove an act on the part of a person other than the declarant when that act is itself an important issue in the case * * *." Legislative Commentary to Rule 803(3), *reprinted in* Kirkpatrick, *Oregon Evidence* 537 (2d ed 1989). As an example, the commentary quotes from *People v. Alcalde*, 24 Cal 2d 177, 148 P2d 627, 633 (1944), which, as relevant to this case, notes:

"A declaration of intention is admissible to show that the declarant did the intended act * * *. A declaration as to what one person intended to do, however, cannot safely be accepted as evidence of what another probably did * * *."

Thus, under OEC 803(3), Forrest's statements that he was going to commit suicide or that he was going to change the beneficiary on his insurance were admissible. However, statements that he was doing so because defendant had agreed to help him were not.[6] Those statements do not come within the provisions of OEC 803(3).

Plaintiffs next argue that Forrest's statements were admissible as a statement against penal and pecuniary interest. OEC 804(3)(c).[7] ORS 163.125 provides that aiding

---

[6] The disputed statements were those relating to that agreement.

[7] OEC 804(3)(c) provides:

another to commit suicide is manslaughter. Plaintiffs argue that Forrest's statements that he had entered into a suicide pact with defendant were against his penal interest because the statements would tend to subject him to criminal liability for conspiracy to assist a suicide. However, Forrest was planning to commit suicide himself, not planning to assist another to commit suicide. Plaintiffs provide no authority that, in Oregon, it is a crime to commit suicide.

Plaintiffs also argue that Forrest's statements were against his pecuniary interest because they would tend to "render invalid a claim by the declarant against another," that is, the beneficiary's claim to the life insurance proceeds. Plaintiffs' position is that, because Forrest and defendant thought that the policy would not pay if Forrest committed suicide, Forrest would think that disclosing the suicide plan would tend to render invalid a claim against the policy. Therefore, plaintiffs contend, "a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true," as required by OEC 804(3)(c). However, just as Forrest's statements were not against *his* penal interests, neither are they against *his* pecuniary interests. Irrespective of the cause of Forrest's death, he would not collect the insurance.

Plaintiffs next address the residual hearsay exception in OEC 804(3)(f), which requires that the statements have "circumstantial guarantees of trustworthiness." Plaintiffs argue that the court did not err in admitting Forrest's statements, because corroborating testimony showed the statements were trustworthy. Plaintiffs point to defendant's corroboration that she had agreed to bury Forrest in her family's plot and to buy him a green marble headstone and that both she and Forrest thought the insurance policy would not pay if he committed suicide; that Walters corroborated that Forrest had been drinking when he went to see Walters

---

"A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

and that defendant had told Forrest to drink before the visit; and that Forrest's statements were made to Diane within one day of the change of beneficiary.

However, we agree with defendant that none of that evidence corroborates the existence or terms of a suicide agreement in which defendant agreed to assist Forrest's suicide in exchange for money. That agreement was revealed only by the testimony of Diane, a financially interested party. She therefore had a motivation for falsehood that makes the exceptions under OEC 804(3) inapplicable. *See State v. Apperson*, 85 Or App 429, 433, 736 P2d 1026 (1987). There were no circumstantial guarantees of trustworthiness that warranted admitting Forrest's statements under OEC 804-(3)(f). It was error to admit the hearsay.

■ Plaintiffs argue that admitting the evidence does not require reversal, because defendant cannot show that Diane's testimony affected a substantial right. They contend that defendant did not object to "similar" testimony from Martha Sundberg who testified that Forrest had "said that he had gotten help to get the drugs that he took * * * from his landlady at the time." Defendant's motion in limine sought to exclude all statements of Forrest offered under OEC 804(3)(f). However, even if the motion did not encompass an objection to Sundberg's testimony, that testimony was not cumulative of Diane's account. Except for other evidence that was also inadmissible, which we discuss below, Diane's testimony was the only evidence of the agreement between Forrest and defendant. Admitting the statements was prejudicial error that requires reversal. *See Haas v. Port of Portland*, 112 Or App 308, 314, 829 P2d 1008, *rev den* 314 Or 391 (1992).

■ Because the issue may arise on remand, we turn to the testimony of Oas, the clinical psychologist whom Forrest saw about a month after his hospitalization. Using his chart notes, Oas testified that his chart notes were made after his sessions with Forrest and were his recollections, perceptions and conclusions of what Forrest had said. He testified that Forrest had talked about having planned suicide and having involved himself in a suicide pact. Oas concluded that the pact involved defendant and another friend. On cross-examination, Oas testified:

"Q: Now you made the note about the suicide and suicide pact in a collusion with [defendant], isn't it a fact that Forrest never directly told you that, that was rather your conclusions you were drawing from what he was telling you?

"A: That's correct.

"Q. And isn't it true that all of these things are your perceptions and conclusions?

"A. That's correct."

Defendant argues that the subjective impressions and conclusions of Oas are hearsay, which, although they may form the basis for expert opinion, may not come into evidence through the expert. Oas was not asked for an expert opinion, and plaintiffs do not contend that Oas's testimony was admissible as an expert opinion under OEC 702. They argue, rather, that Forrest's statements were admissible under OEC 803(4) as "statements made for purposes of medical diagnosis or treatment and describing medical history * * *."

We do not agree. Oas stated his conclusion that Forrest and defendant had a suicide pact. Forrest did not tell him that. Oas's conclusion was not a statement made by Forrest for purposes of medical diagnosis or treatment. Plaintiffs alternatively argue that the testimony regarding Forrest's discussion of suicide is admissible under OEC 803(5), which provides that the hearsay rule does not exclude "[a] memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately * * *."[8]

We agree with defendant that OEC 803(5) does not permit plaintiffs to convert Oas's conclusion about a suicide pact into admissible evidence. Oas did not, at any time, know that there was an agreement between defendant and Forrest; he had an impression that there was one. An impression is not the same as insufficient recollection concerning a matter about which he once had knowledge.

---

[8] The trial court apparently admitted the testimony under that provision.

■    Defendant's last assignment of error is that the trial court erred in denying her motion for a directed verdict on both claims. Her argument is that, without the inadmissible hearsay evidence, there is no evidence of a contract between defendant and Forrest to support the jury's verdict. Because plaintiffs had the verdict, we cannot set it aside unless we can affirmatively say that there is no evidence from which the jury could have found the facts to establish the elements of plaintiffs' cause of action. *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984).

■    In the absence of the inadmissible evidence, there was no evidence from which the jury could determine that Forrest agreed to change the beneficiary to defendant in return for her assistance in his suicide. Defendant's motion for a directed verdict on the claim for declaratory judgment should have been granted. *See Quinn v. Walters*, 320 Or 233, 243, 881 P2d 795 (1994) (in absence of admissible evidence, there was not sufficient evidence to establish that consent to adoption was invalid, and adoption judgment was correctly entered). However, plaintiffs also alleged a claim for interference with economic relations by undue influence. They alleged that defendant interfered with their economic interest by improper means or in pursuing the illegal suicide pact. We do not agree that lack of evidence as to the suicide contract necessarily also precludes the jury's consideration of the undue influence claim. There was evidence, *inter alia*, of a confidential relationship between defendant and Forrest, that defendant was dominating and that defendant knew about the policy and had advised him to find out whether it could be changed. There was evidence to withstand a motion for a directed verdict as to whether defendant had used undue influence to effect the change of beneficiary.

Judgment on claim for declaratory judgment reversed and remanded with instructions to enter judgment for defendant Morgan; judgment on claim for interference with economic relations reversed and remanded.